ENCYCLOPÆDIA BRITANNICA CO. v. AMERICAN NEWSPAPER
ASS'N et al.

(Circuit Court, D. New Jersey. June 23, 1904.)

1. COPYRIGHT—NECESSARY PROOFS.
   Where it is alleged that a copyrighted article has been infringed, the
   copyrighted article and the alleged infringing article, or so much thereof
   as may be necessary for intelligent comparisons, must be included in the
   proofs.

2. SAME—EXPERT WITNESSES.
   The analyses and comparisons of expert witnesses in a case of alleged
   infringement of copyrights may be received in evidence, but only as aids
   to the court, upon whom is imposed the duty of making the final com-
   parisons.

3. SAME—SUBSTANTIAL IDENTITY.
   Substantial identity between a copyrighted article and an article al-
   leged to be an infringing one creates a presumption against the publisher
   of the latter article, which he must overcome.

4. SAME—LACHES.
   Laches cannot be successfully invoked in aid of a publisher of an in-
   fringing article when it does not appear that the owner of the copyrighted
   article had knowledge of the infringement, or that he had notice of any
   facts sufficient to put him upon inquiry.

5. SAME—PRELIMINARY INJUNCTION.
   Where there is no doubt of the infringement, and no defense rendering
   it inequitable to grant the relief prayed for, a preliminary injunction
   will be granted.

(Syllabus by the Court.)

In Equity.   On motion for preliminary injunction

Frederic R. Kellogg and G. D. W. Vroom, for complainant.
James Buchanan and John G. Johnson, for defendants.

LANNING, District Judge.   This is an application for a preliminary
injunction, and has been heard on bill, answers, and affidavits, the an-
swers being sworn to and used as affidavits.

It appears that, early in 1875, A. & C. Black, of Edinburgh, Scotland,
began the publication in Scotland of the work entitled "The Encyclo-
pædia Britannica, a Dictionary of Arts, Sciences and General Litera-
ture, Ninth Edition."   In the same year, the copyright laws of this
country not then furnishing protection to foreign authors or pub-
lishers, one Joseph M. Stoddart, Jr., trading under the name of J. M.
Stoddart & Co., of Philadelphia, began the publication of the same work
in this country.   Some time between 1875 and 1879, the exact time
not being shown, the Blacks entered into an arrangement with Charles
Scribner, trading as Charles Scribner's Sons, of New York, for the
publication in the United States of the Edinburgh edition of the work.
Suits were instituted about 1879 between the Blacks and Stoddart,
and between Scribner and Stoddart, which led to an agreement dated
March 24, 1881, "between Joseph M. Stoddart, Junior, doing business
at Philadelphia, Pennsylvania, as J. M. Stoddart & Co., and Charles
M. Scribner, doing business at the City of New York as Charles
Scribner's Sons."   This agreement, after reciting that Stoddart "was

the proprietor and publisher of a certain work called the American Reprint of the Encyclopædia Britannica, Ninth Edition," that Scribner "was the importer of the Edinburgh Subscription Edition of the Encyclopædia Britannica,. Ninth Edition, which he purchases of Messrs. A. & C. Black, of Edinburgh, Scotland," and that controversies, disputes, and litigations had arisen between Stoddart on the one side and the Blacks and Scribner on the other side, declares, inter alia, that "the said Scribner also agrees that no suit shall hereafter be brought by him, nor by them [the Blacks] with his consent or co-operation, against said Stoddart, or his agents, employees or servants, or book-sellers selling the American Reprint of the Encyclopædia Britannica for any infringement, past or future, or alleged infringement of any copyright law." The agreement further provides that "it is also understood between the parties hereto that this agreement and the several understandings therein shall extend to and bind the representatives and assigns of the respective parties."

Previous to the date of this agreement, articles included in the edition published by Scribner had been written by American authors, and copyrighted, under the following titles, viz.: "Galveston," "Georgia," "Horace Greeley," "Hayti," "Homestead," "Honduras," "British Honduras," "Illinois," and "Indiana." Between the date of the agreement and April 6, 1888, the following articles, also included in the Scribner edition, were written by American authors, and copyrighted, viz.: Articles on "Modern History and Present Distribution of North American Indians," "Indian Territory," "Lafayette," "Abraham Lincoln," "Henry W. Longfellow," "Louisiana," "Maine," "Maryland," "Massachusetts," and "United States, Part 1, History and Constitution." These articles were originally .published in book or pamphlet form, and the titles to the copyrights are now, by means of sundry assignments, vested in the complainant, the Encyclopædia Britannica Company, a corporation of Illinois, which also owns and publishes the edition formerly owned and published by the Blacks.

In 1890, Richard S. Peale, of Chicago, commenced the publication of another American edition of the Encyclopædia Britannica. He obtained for it, he says, in the places of the copyrighted articles above mentioned, other articles by other authors on the same subjects. These last-mentioned articles, he further says, were printed and inserted in his edition "exactly as written by the authors." The defendant the Werner Company has succeeded to the rights of Richard S. Peale in the American edition formerly published by Peale, and that company, and the other defendant, the American Newspaper Association, both being New Jersey corporations, are now engaged in publishing and selling that edition, which still includes the articles alleged to have been written in 1890 for Peale.

The complainant insists that the articles written in 1890 for Peale, and now included in the defendants' edition, are infringements of its copyrights. The primary evidence of the infringements must be found, if found. at all, in comparisons of the two sets of articles. And these comparisons must be made by the court, or by a master to whom such duty has been referred. The comparisons of expert witnesses may very properly be received in evidence, but only as aids to the court. This

remark is made because no copies of the articles on some of the subjects are included in the proofs, although they do include the affidavits of expert witnesses, containing their comparisons of the articles, and their opinions to the effect that the defendants' articles are largely copies of the complainant's copyrighted articles. The opinions of experts, however competent they may be to discover plagiarisms and piracies, are secondary, and not primary, evidence. It is the court, and not expert witnesses, who must determine the question whether one's copyright has been infringed. Lawrence v. Dana, Fed. Cas. No. 8,136. This rule excludes from present consideration the articles on "Galveston," "Horace Greeley," "Hayti," "Illinois," "Indiana," "Modern History and Present Distribution of North American Indians," "Lincoln," "Longfellow," "Maine," "Maryland," "Massachusetts," and "United States, Part 1, History and Constitution."

The articles on the remaining seven subjects cannot be so excluded. As to each of them the proofs contain verified copies of the complainant's copyrighted article and of the alleged infringing article of the defendants. These relate to the subjects "Georgia," "Homestead," "Honduras," "British Honduras," "Indian Territory," "Lafayette," and "Louisiana." Much aid has been had in the work of examining these articles by the comparisons contained in the proofs, and the opinion now reached is that the articles on the last seven subjects named, published in the defendants' edition, were modeled after, and to a very substantial degree taken from, the copyrighted articles on the same subjects contained in the complainant's edition.

In the two articles on "Georgia," the first fact to be noted is the striking resemblance between the headings to the several sections. In some cases they are identical, in others slightly changed in phraseology, but in all cases substantially the same. In the bodies of the two articles there are numerous instances of the duplication of ideas and sentences. As illustrations, some parallel passages are hereunder given:

*From Complainant's Edition:*

"Georgia has three distinctly marked zones, varying in soil, climate and productions. Her sea coast is similar to that of the Carolinas, being skirted by fertile islands, separated from the mainland by narrow lagoons or by sounds. This section is essentially tropical."

"In the southwest the soil though light and sandy, produces cotton. In southern Georgia there are millions of acres of magnificent yellow pine forests of great value for house or ship building, and in these forests turpentine plantations have been opened. The live-oak, also valuable for ship-building purposes, abounds in the southeast of the State. The swamps afford cedar and cypress, the central region oak and hickory."

"The higher branches of education are well represented. As early as

*From Defendants' Edition:*

"This variation of surface gives Georgia three distinct zones, differing in soil, productions and climate. Low islands, separated by narrow necks from the mainland, skirt her sea coast and produce cotton of a superior quality, known as sea island cotton. This coast section with the adjacent islands is essentially tropical."

"In the southwest the soil is light and sandy. Millions of feet of yellow pine, of great value in ship and house building, are ready to be used. In the southern part of the state turpentine manufactories have been opened up in the forests. In the southeast is the live oak, much valued in ship building, while the many swamps afford cypress, cedar and palmetto."

"The higher branches are well provided for. As early as 1801 steps

1801 steps for founding a university were taken at Athens. The first commencement took place in 1804. The college proper (Franklin College at Athens) annually admits free of charge 'fifty meritorious young men of limited means' and also such as may be studying for the ministry who need aid. There is also connected with the university a medical college, located at Augusta, and an agricultural college at Dahlonega, with nearly 250 students, whose tuition is free. The State college of agriculture and mechanic arts, also connected with the university, has a special endowment derived from the United States of $240,000; the whole endowment of the university is $376,500. The university, exclusive of its establishments at Augusta and Dahlonega, has five departments, 13 professors and 200 students, with a library of 14,000 volumes, and two literary societies. Besides the usual collegiate course, there are a preparatory school and a law school."

were taken to found Franklin College at Athens, and the first commencement was held there in 1804. She admits to her privileges each year, fifty young men free of charge; also as many as may stand in need of aid who are studying for the ministry. Connected with Franklin University there is a medical department at Augusta and an agricultural department at Dahlonega, with about 250 students, whose tuition is free. The United States Government fixed an endowment of $240,000 on the State Agricultural and Mechanical Arts department also connected with the university, which makes the total endowment fund $376,500. The university, exclusive of its departments of letters and agriculture, has five departments, 13 professors and 200 students, with a library containing over 1,400 volumes. In connection with the University there is a preparatory course and a law school."

In the two articles on "Homestead" there are numerous instances of similar passages. But two of them will be cited:

### From Complainant's Edition:

"In such a case the original claimant will not be permitted to make another entry, as the law allows but one homestead privilege. It is essential that the person making a homestead entry should know that no one else has located upon the land and begun improvements as the foundation of a claim under the pre-emption laws, for such a claim would antedate his own. Having resided upon and cultivated his claim for five years, the settler is allowed two years more, but no longer, in which to make his 'final proof.' "

"The first step in securing a preemption right is to go upon the land and commence 'improvements.' When this has been done, if the land is 'offered'—that is, if at some time it has been offered at public sale by proclamation of the President, or otherwise —the applicant, within thirty days from date of his settlement, must file with the district land office a declaratory statement setting forth his claim; and within one year from date of settlement he must appear before the registrar and receiver, and make proof of actual residence on and cultivation

### From Defendants' Edition:

"The original claimant is not permitted to make a second entry, as but one homestead privilege is allowed by law. It is important that the applicant making a homestead entry should know that no one else has located, and made improvements upon the land preparatory to a claim under the pre-emption laws, as such a claim, under the land laws, would antedate his own. After the applicant has resided upon and cultivated his claim for five years, he is allowed two years more in which to make 'final proof.' "

"The first step in securing a preemption claim is to go upon the land, and begin to make improvements. When this has been done and the land is offered for sale, by proclamation of the President or otherwise, the preemptor must file a declaratory statement with the District Land Office setting forth his claim, within thirty days. And within a year from the date of settlement, he must appear before the Registrar and Receiver, and make proof of his actual residence upon, and cultivation of the land. He will then be permitted to obtain

of the tract. He will then be permitted to obtain title to the land, by locating upon it land warrants or scrip, or by paying for it with cash at the rate of $1.25 per acre, or, if within the limits of a public improvement grant, at the rate of $2.50 per acre. In case the land has not been offered at public sale, the applicant has three months after settlement within which to file his declaratory statement with the local land officers, and thirty-three months from settlement within which to make final proof and payment for the land. If the land is unsurveyed when the settlement is made, the claimant must file his declaratory statement within three months from the date of the receipt at the district land office of the approved plat of survey of the township embracing the tract."

title to the tract by paying $1.25 per acre, or, if the land is within the limits of the public improvement grant, $2.50 per acre. When the land on which the pre-emptor has settled has not been offered for sale, he is given three months in which to file his declaratory statement, and thirty-three months from the time of his settlement, in which to make final proof and pay for the land. In the case where land is unsurveyed, when the settlement is first made, the applicant must file his declaration within three months from the date of the receipt at the District Land Office of the approved plat of the survey of the township, embracing said applicant's claim."

One cannot read these passages without observing, in each pair of them, not merely the numerous cases of identical phraseology, but the common sequences of thought contained in them. In the last two parallel passages, for example, the order of the subjects mentioned is the same, and is as follows: The first step in securing a pre-emption right, offering the land for sale, proclamation by the President, filing declaratory statement, appearing before registrar and receiver, making proof of actual residence, obtaining title to the land, proceedings where land has not been offered for sale, time within which final proof and payment may be made, and proceedings where land is unsurveyed.

Quotations from the remaining articles do not seem necessary. It is sufficient to say that the proofs show such identities and resemblances of plan and language, and such common sequences of thought, between the two articles on each of the seven subjects, that no other opinion can be entertained than that very considerable portions of the defendants' articles were taken from the complainant's articles. That opinion is confirmed by the fact that the defendants have produced the affidavit of the alleged author of each of the seven articles, and that, while each of them admits having written in 1890 one or more articles for Richard S. Peale without reference to or use of the complainant's articles, no one of them states that he wrote in its present form any one of the articles contained in the defendants' edition. It is true that Peale says the articles furnished to him by these authors were printed exactly as they were written. But he stands alone in this statement. The convincing evidence furnished by the articles themselves overcomes his naked statement. Substantial identity, or a striking resemblance between the work complained of and that for which protection is claimed, creates a presumption of unlawful copying, which must be overcome by the defendant. Drone on Copyright, pp. 400, 430. And what amounts to substantial identity is a question of fact, to be determined in each case by a comparison of the two works. Drone on Copyright, p. 408; Emerson v. Davies, 3 Story, 793, Fed. Cas. No. 4,436; Lawrence v. Dana, supra.

The complainant is therefore entitled to the injunction sought unless there be some merit in the defenses set up at the argument. These defenses will now be considered.

It is urged, in the first place, by the counsel for the defendants, that the act of the defendants in publishing the articles complained of during the pendency of the suit will not result in irreparable injury to the complainant, and therefore that a preliminary injunction ought not to issue. The answer to this objection is that, if the defendants have no right to continue their publications, the injury to the complainant is one for which damages awarded on an accounting or in a suit at law will furnish utterly inadequate redress. This is illustrated in the case of West Publishing Co. v. Lawyers' Co-operative Publishing Co., 79 Fed. 756, 25 C. C. A. 648, 35 L. R. A. 400, where, in a case very like the one now in hand, the court, on final hearing, continued a preliminary injunction, ordered an accounting of profits, and, because of the impossibility of segregating the profits for the specific paragraphs there enjoined, ultimately gave a decree for six cents.

In the second place, it is said that a preliminary injunction ought not to be allowed because the defendants have a large capital invested and 1,500 or 2,000 men employed in their business, and that an injunction would do them irreparable injury. It is true that in cases of this nature the court will sometimes balance inconveniences, and withhold a preliminary injunction where its allowance will cast a burden upon the defendant disproportionate to the relief which its allowance will afford the complainant. But this is not such a case. If the injunction be here allowed, the defendants may continue their business as soon as they shall have substituted for the articles now published by them other articles which do not infringe the complainant's copyrighted articles.

In the third place, it is said that the provisions of the agreement between Stoddart and Scribner made on March 24, 1881, deprive the complainant of the right to maintain this suit. The argument is that Scribner, who, at the time of executing the agreement, was the record owner of certain of the copyrights, held those copyrights in trust for the Blacks, and that he agreed that no suit for infringement of any copyright, past or future, should thereafter be brought by him or by the Blacks. But it will be observed that that agreement, the provisions of which material to this point have already been cited, does not show that Scribner had any authority to represent the Blacks, or that he attempted to do so. He was an importer and purchaser of the Edinburgh, now the complainant's, edition; he was a party to the agreement in his individual capacity only; and he agreed that no suit should thereafter be brought by the Blacks "with his consent or co-operation." Stoddart acquired no rights or privileges, under that agreement, from the Blacks. He did acquire thereunder certain rights from Scribner, but there is no proof that any of these rights were ever in any wise transmitted to either of the defendants.

Lastly, it is insisted that a preliminary injunction should not be allowed because of the laches of the complainant and its predecessors in title. To support this defense, reference has been made to the

130 F.—30

cases of Black v. Ehrich et al. (C. C.) 44 Fed. 793, and Black v. Henry G. Allen Co. (C. C.) 56 Fed. 764, from which, as I understand the arguments of the defendants' counsel, the inference is drawn that the Blacks, complainant's predecessors in title, had knowledge of the infringements alleged in the present case, and that their silence since those cases were decided must be construed as acquiescence in the publications now complained of. The argument is based on false premises. Black v. Ehrich et al. was decided on a motion for preliminary injunction on January 31, 1891, and the proofs in the present case show that the bill of complaint in that case was filed July 11, 1890, and a supplemental bill on October 30, 1890. The defendants, Ehrich Bros., were selling agents of the edition of the Encyclopædia Britannica then published by R. S. Peale & Co., and the complaint was that Ehrich Bros. were engaged in unlawful competition with the Blacks. The case of Black v. Henry G. Allen & Co. was decided on final hearing on April 14, 1893, but a reference to the same case in 42 Fed. 618, 9 L. R. A. 433, discloses the fact that the court rendered an opinion on a demurrer to the bill of complaint on June 16, 1890. By the demurrer the Henry G. Allen Company raised the question whether they had not the legal right to sell an American edition of the Encyclopædia Britannica which should contain, not only the parts of the Edinburgh edition which were admittedly publici juris and could not be copyrighted in the United States, but also the articles in the Edinburgh edition which had been copyrighted in the United States. The decision was against their contention. It appears, then, that neither Black v. Ehrich et al. nor Black v. Henry G. Allen Co. had any relation to the articles now complained of. None of these articles was in existence when those suits were commenced. Indeed, the defendants have filed the affidavit of Richard S. Peale himself, in which he declares that it was because of suits instituted against his agents that he secured the preparation of the articles now complained of. And Paul E. Werner, the president of the Werner Company, also swears that the articles now objected to were first published, as he is informed and believes, in 1891. The Blacks and their successors in title to the copyrighted articles may well have been induced by such conduct on the part of Peale to believe that he had utterly abandoned his purpose of including in his edition of the Encyclopædia the copyrighted articles of the Edinburgh edition, and that the articles subsequently published by Peale were in truth original articles, and not pirated ones. Neither the Blacks nor their successors in title had cast upon them any obligation to be astute in discovering the piracy. There seemed to be no call for a critical examination of the new articles secured by Peale, and it was not until December, 1902, that Franklin H. Hooper discovered the remarkable similarities between some of the copyrighted articles and the articles on corresponding subjects in the defendants' edition. His discovery led to the employment of other persons to extend the investigation, and finally to the analyses and comparisons contained in the affidavits of eminent authors now submitted to the court. In the circumstances of this case, the defense of laches cannot be successfully invoked. The cases in which laches has been

considered a bar to equitable relief proceed on the assumption that the party to whom it is imputed has knowledge of his rights. Halstead v. Grinnan, 152 U. S. 412, 14 Sup. Ct. 641, 38 L. Ed. 495; Ritchie v. Sayres (C. C.) 100 Fed. 520. Laches is not, like limitation, a mere matter of time, but, rather, a question of the inequity of granting the relief. Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738; Old Colony Trust Co. v. Dubuque Light & Traction Co. (C. C.) 89 Fed. 794.

In this case, there would be inequity in refusing to grant the relief prayed for. The objectionable parts of the defendants' articles are so intermingled with the other parts that it is impossible satisfactorily to separate them. In all such cases the rule is to enjoin the publication of the whole of the literary matter in which the piracy is found. Farmer v. Elstner (C. C.) 33 Fed. 494; West Publishing Co. v. Lawyers' Co-operative Publishing Co., supra.

A preliminary injunction will be allowed, restraining the defendants, and each of them, and their agents and employés, until the further order of the court, from printing, publishing, selling, or offering for sale any volumes of the defendants' edition of the Encyclopædia containing in their present form any of the seven articles now included in that edition on the subjects "Georgia," "Homestead," "Honduras," "British Honduras," "Indian Territory," "Lafayette," and "Louisiana." The restraining order heretofore allowed must be vacated as to the remaining subjects.