**KALO INOCULANT CO. v. FUNK BROS. SEED CO. (two cases).**

**Nos. 9040, 9041.**

Circuit Court of Appeals, Seventh Circuit.

June 12, 1947.

J. Bernhard Thiess, Sidney Neuman and M. Hudson Rathburn, all of Chicago, Ill., for appellant Kalo.

H. A. Toulmin, Jr. and D. C. Staley, both of Dayton, Ohio, and Bernard A. Schroeder, of Chicago, Ill., and Toulmin & Toulmin, of Dayton, Ohio, for appellee Funk.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Plaintiff, manufacturer and vendor of bacterial inoculant for leguminous plants, brought suit for infringement of patent to Bond No. 2,200,532, issued May 14, 1940, on application filed August 24, 1938, and assigned to plaintiff, against defendant, wholesale and retail dealer in certain leguminous inoculants, alleged to be infringing products manufactured by The Agricultural Laboratories, Inc., of Columbus, Ohio, who assumed control and direction of the defense. The District Court adjudged the claims upon which plaintiff re-

lied invalid for want of invention, finding, however, that, if they were valid, defendant infringed. The court dismissed defendant's counterclaim for declaratory judgment of invalidity of all claims of the patents, including those in suit. Plaintiff appeals from the judgment of invalidity and defendant from the dismissal of its cross-complaint.

The essential facts, as reflected by the court's findings, are not largely in dispute. The patent contains 14 claims. Those in suit 1, 3, 4, 5, 6, 7, 8, 13 and 14 and 2, not in suit, are product claims.[1] The others, 9, 10, 11 and 12, are process or method claims. The patent is entitled "Bacterial Inoculant for Leguminous Plants." Its descriptive matter includes recital of scientific facts, then known to scientists delving in the art, and prescribes certain old conventional tests necessary in successful production of bacteria for leguminous plants. The claims cover a composite culture in which are included a plurality of species of bacteria belonging to the general Rhizobium genus, carried in a conventional base. The claim of invention rests primarily upon the fact that each separate culture of the several different species included in the composite inoculant is unaffected by the presence of others in its ability to fix nitrogen in the leguminous plant for which it is specific. It is undisputed that bacteria of this genus promote nitrogen fixation in leguminous plants and are found in nature. The precise mechanism of nitrogen fixation is not understood, but it has been well known for many years that it can be achieved only when the plant grows in symbiotic relationship with certain bacteria of the genus. Leguminous plants capable of such relationship with Rhizobia include peas, beans, alfalfa, red clover, white clover, vetch, lupines and others. When nitrogen is collected or fixed, it appears in the form of nodules on the roots of the plants; the bacteria infect the roots, causing formation of the nodules in which nitrogen fixation occurs. Scientists have known for a long time that Rhizobium bacteria promote ni-

trogen fixation when a certain species or strain of the same is applied in symbiotic relationship to the leguminous plant of the cross inoculation group to which the particular species or strain is specific. Manufacturers of inoculants have, for a long time, taken these bacteria as found in nature, where they perform this nitrogen fixation, and, by well known laboratory methods of culture, increased their number, changing in no way their shape, form or characteristics, physiologically or otherwise, placed them in a powder or liquid base, as a carrying medium, and sold them for use by agriculturists in the inoculation of leguminous plants. Bond claims to be the first successfully to combine different species of the genus in one composite product so that each species will continue to perform its functions when brought into its proper symbiotic relationship. In other words, a specific species of the genus Rhizobium, functioning with its corresponding species of legume in an inoculant for its specific species of legume had, as we have said, been successfully produced and used with desirable results. As to the facts thus far related, we think there is no substantial dispute.

Bond does not claim to have invented any new species of Rhizobium bacteria but, as the District Court found, he discovered that among the bacteria found widely spread in nature there exist not only mutually inhibitive species but also mutually noninhibitive strains which can be selected and isolated and, when so selected, isolated and combined, continue to perform the same functions that they do in nature. The method of culture of single strains of bacteria described in Bond's patent and his method of placing bacteria in a carrying medium or base were well known in the art. So, too, was the proper character of the base or carrying medium. In fact, Bond's claim of invention arises from his averment of discovery that, though in the bacteria genus Rhizobium some species, when combined with others, had an injurious or adverse effect upon each other,

---

[1] Claim 4, we think, is typical of this group. It reads: An inoculant for leguminous plants comprising a plurality of selected mutually noninhibitive strains of different species of bacteria of the genus Rhizobium, said strains being unaffected by each other in respect to their ability to fix nitrogen in the leguminous plant for which they are specific.

when properly selected and combined, certain of them were noninhibitive of each other. This inhibitive character of certain species was already known to scientists, but, he added to that knowledge his own discovery, as a result of empirical tests, that there are also strains or species of bacteria involved which are noninhibitive of others, in other words, that there are noninhibitive cooperative strains as well as inhibitive, destructive strains. Thus he said: "It has heretofore been considered impractical to prepare a composite inoculant containing organisms which will cause nodulation on more than one of the cross inoculation groups. This has not been done because it was generally believed that one species produced an inhibitory effect on another species within the same culture, whereby symbiotic nitrogen fixation by the plant and the organism was inhibited or even prevented." His teaching was that he could, by conventional tests, delete the inhibitive strains and retain the noninhibitive ones and that these, when combined, could be put into a composite inoculant where the same desirable results could be achieved by each appropriate species of bacteria as would be accomplished if only a single species of bacteria were included in the inoculant. Upon this we think the question of invention hinges.

The District Judge thought invention was not achieved, saying that he found the claims invalid because they did not involve invention or discovery of any new or useful art. This, he said, he did "with reluctance," as he was impressed with the very "great diligence and ingenuity" of Bond and with the results he had achieved. But, though Bond's work was not to be minimized, the Judge believed it could not be classified under any subject defined as patentable by the congressional act. However, he made a specific finding that Bond did discover that there exist in nature noninhibitive strains and that these noninhibitive strains may be selected, isolated and combined and still perform satisfactorily their ordinary desirable functions. Upon this finding there was controverted evidence, but our examination of the record is convincing that that supporting the finding is rather conclusive and that there is no

justification for us to declare the District Court in error in making it. Consequently the specific question which now confronts us is whether, upon the finding of fact, the court erred in concluding that, under the law, Bond made nothing patentable.

We have previously said that Bond recognized everything that had been done by scientists delving in this art prior to his application. He knew that bacteriologists were well informed as to the conventional tests and the essentials of development of a bacterial culture and possessed all the knowledge necessary to successful isolation and culture of bacteria. He recognized that prior delvers in the art were aware of proper media for lodgment and distribution of cultures fully developed and ready for commercial use. He made no claim to have discovered in nature any species of bacteria not previously known. He knew that the different species properly suitable for the several functions to be performed had been thought to be mutually inhibitive. He did discover the fact, as the court found, that there are strains proper for the desired purpose of combination which possess no antagonistic characteristics which, when combined, do not tend to suppress the growth of any of other species, all of which, when combined, develop in wholly noninhibited, unimpeded growth. He emphasized the fact that composite inoculants had not been successful previously and that this was generally but erroneously thought to be because the various strains when combined always inhibited each other.

This, he said, was the status of the art when in June, 1937, he first discussed with the president of his company the possibility of the manufacture of a practical composite or mixed leguminous culture. He was familiar at that time with adverse opinion of authorities in the field in regard to mixed cultures. During that summer he attended the University of Wisconsin and there investigated the literature in the library of the College of Agriculture. In his research he found adverse references to the use of mixed cultures containing more than one species of leguminous organisms and learned that it had been publicly reported that when two or more different species were mixed, they had a defi-

nite antagonistic effect upon each other which reduced their ability to benefit the host plant. He testified that he found nothing to indicate that anyone had ever thought that there were in existence strains or species in which inhibition did not exist. The known teaching, so far as he could discover at that time, was that a species of the genus might be "very good when used alone, * * * be very beneficial, * * * be a highly efficient strain, but, when mixed with other strains would become less efficient and produce a lower yield than the same strain when used alone." The so-called Bible of the inoculant art, "Root Nodule Bacteria and Leguminous Plants," by Fred, Baldwin and McCoy, University of Wisconsin Studies in Science, Number 5, 1932, reported that composite cultures "offer advantages and many disadvantages" and that "it is desirable to have only the one type of organism in the culture."

Bearing in mind that the District Court found specifically that Bond discovered that there are noninhibitive strains of the proper species of bacteria as well as inhibitive species and that Bond had been greatly diligent and ingenious, it becomes obvious, we think, that he made an inventive step forward in the art of production and commercial distribution of composite inoculants. It was desirable, as he pointed out in his patent, that farmers should have one composite inoculant which could be used in producing their different crops. In such case it would be unnecessary for dealers to keep in inventory and for the farmer to buy, preserve and maintain several different inoculants. His company was hopeful that he could manage to produce such a satisfactory composite inoculant. His problem was to find a method by which he might get away from the inhibitive, antagonistic, impeding characteristics of the different strains of bacteria when combined and, at the same time, produce a composite that would contain and maintain the proper number of live and active bacteria of each species throughout the useful life of the product. This problem had not been solved by any one and it apparently daunted Bond, for, at first, it appeared insoluble. However, in the course of continued probing, he made the discovery which nobody, prior to

that time, had uncovered, namely, that there exist in nature certain strains of nodule bacteria which do not assert an inhibitive and antagonistic effect on each other and that such mutual noninhibitive strains can, by well known methods, be selected and isolated for use in a mixed culture so that the final composite product will contain, throughout its desirable life, a sufficient number of live and active bacteria of each species, lodging them in a base material substantially free of nutrients. His scientific investigation led to a proper solution, which we think the evidence shows had baffled the workers in the prior art because of their mistaken assumption of supposedly universal inhibitive effect encountered in mixed cultures. Thus, in making one of his tests, Bond found that one of the proper strains of soy bean bacteria, "Rhizobium Japonicum," was found to produce 34.8% more nitrogen when employed alone on soy bean seed than when employed on the same seed in the presence of clover bacteria and alfalfa bacteria (Rhizobium trifolii and Rhizobium meliloti). He found also that a strain of clover bacteria would produce 119% more nitrogen when employed alone than when employed in the presence of soy bean bacteria and alfalfa bacteria. Inhibitive effect was the restraining factor preventing a successful commercial composite inoculant and this factor he taught the art to avoid by discovering that there are noninhibitive bacteria and teaching that they can be successfully employed, when combined, without injury to any of the other constituent species. Thus he says in his patent: "The composite culture may be prepared by selecting strains of the desired species of the Rhizobia which will produce optimum beneficial results to the host plant and will not be adversely affected by each other." And, that he taught how this might be done is illustrated by this language: "* * * Each of the strains is tested separately with its own host plant in order to select out those which are most effective in respect to the development of the host plant and the quantity of nitrogen fixed thereby. * * * The cultures showing the best results in association with the host plant may then be selected and the various strains of the different species may be

986

mixed together in order to determine if the nitrogen-fixing ability of one species is adversely affected by the mere presence of another, as has been previously thought to be the case. Thus, it has been previously considered that the nitrogen-fixing ability of Rhizobium trifolii in symbiotic relationship with red clover is markedly inhibited if strains of Rhizobium meliloti, Rhizobium japonicum, or other species of the Rhizobia were present within the same inoculant. It has been found, however, that, by a suitable process of selection of strains in the manner indicated above, a composite culture may be obtained which may be used to effect a plurality of cross-inoculation groups with optimum results."

For convenience sake, he designated the noninhibitive strains as "alpha" organisms and said that he had discovered no method by which they might be differentiated from the mutually inhibitive group of Rhizobia other than by making actual nitrogen fixation tests by inoculating the various host plants with the proposed mixture of the Rhizobia. But by "alpha" strains he did not mean that he had discovered a new bacteria but merely that certain existing bacteria are noninhibitive.

The mistake of the District Court, we think, lay in its conclusion that this did not amount to patentable invention within the meaning of the statute. Though the court recognized the value of Bond's work, it thought that he had merely discovered a law of nature, whereas in fact the evidence is clear that what he discovered was that certain existing bacteria do not possess the mutually inhibitive characteristics which had previously prevented a successful commercial composite inoculant and that those uninhibitive species may be successfully combined. It was this contribution of noninhibitive strains which successfully combine that brought about a new patentable composition. This was application of scientific knowledge to things existing in nature and the utilization of them in a desirable composite product which had not been previously achieved but which he did achieve and of which the public now has the benefit.

We think this is clearly within the decisive definitions of patentable invention. It is in accord with the decision of this court in Dennis et al. v. Pitner et al., 7 Cir., 106 F.2d 142 and that of the Supreme Court in Mackay Radio & Telegraph Co. v. Radio Corp., 306 U.S. 86, 618, 59 S.Ct. 427, 83 L.Ed. 506. See also Union Carbide Co. v. American Carbide Co., 2 Cir., 181 F. 104; J. E. Baker Co. v. Kennedy Refractories Co., 3 Cir., 253 F. 739. Bond taught the method by which the composite is to be made and claims the product composed by that method, namely, a composite inoculant, comprised of different species of bacteria in sufficient numbers of each species. The noninhibitive property of bacteria was not previously known and when Bond discovered it and taught a successful composition of noninhibitive strains in combination of elements in one inoculant operating successfully on several different groups of legumes, he did much more than discover a law of nature. He made a new and different composition, one contributing utility and economy to the manufacture and distribution of commercial inoculants. As this court said, in Dennis et al. v. Pitner et al., supra, the discovery of a natural phenomenon, or of a quality or attribute of a well known article and application of that quality in a successful combination which is of value to mankind, is entitled to patent protection. We adhere to that pronouncement and we think Bond achieved that end.

Defendant has directed our attention to certain prior art patents, publications and uses, all of which we have studiously examined. We might discuss them at length, but we think it sufficient to say that the sum total of all of the prior teaching is that mixed inoculants had been in existence before but that they had been composed by hit and run methods without regard to whether the various species included in the composite worked adversely to one another or inhibited one another in their respective growths. Some of them may have been successful, because, by mere chance, only noninhibitive species were included. Some of them must have been wholly useless when they included only inhibitive species, and the result must have been far from satisfactory when they included both inhibitive and noninhibitive species. Nothing in

the art suggests the slightest conception of Bond's solution of the problem.

■ Defendant insists also, as it did in the District Court, that the patent is either the invention of Lusk or the joint invention of Lusk and Bond. The District Court found that, though the general idea of the desirability of a composite culture was suggested by Lusk, the discovery of the concrete solution of the problem was the act of Bond and that the invention or discovery, if any, was his sole act. We agree with the court that, under the evidence, all that Lusk did was to suggest that it would be highly desirable for his company to have a composite inoculant such as Bond later invented; that Lusk had no conception of what the problem really involved or of how to solve it and that all of the investigation, research and thought leading to its solution was the work of the patentee. Certainly it can not be said that, upon the evidence in this record, this court is justified in setting aside the finding of the District Court.

■ Defendant also contends, as it did in the District Court, that the plaintiff misrepresented his application to the Patent Office and, therefore, does not come into court with clean hands. We think there is no evidence justifying a finding to this effect, and again we find that the court made a specific finding in this respect that Bond believed in the existence of the inhibitive effect of various species at the time he instituted his research and acted in good faith when, in his application for the patent in suit, he said that it had previously been considered impractical to prepare a composite inoculant containing organisms which would produce nodulation on more than one of the cross inoculation groups because it was generally believed that one species produced an inhibitory effect on another species within the same culture, whereby symbiotic nitrogen fixation by the plant and the organism was inhibited or even prevented, and that plaintiff was not guilty of the charge of unclean hands. We have examined the evidence of what transpired in the Patent Office. We find nothing in the record to justify us in ignoring or declaring erroneous this specific finding of the District Court.

■ Defendant insists that the description of the patent is insufficient, under 35 U.S.C.A. § 33, which requires inventors to describe clearly their inventions. The District Court was not impressed with this contention and we do not think we would be justified in declaring the patent invalid because of anything in this respect appearing in the record. True, routine experiments are to be employed, but these tests are conventional and well known to bacteriologists. The mere provision that the compound shall be made of strains or species of bacteria selected by familiar methods leaves nothing indefinite in the description. If noninhibitive strains were readily identifiable in nature as separate species, without scientific tests, of course tests would not be necessary, but no such good fortune confronts the scientist when he starts to isolate bacteria. There is no weight and measure method by which he may determine the quality or quantity of bacteria he is supposed to put into a composite product; there is available only selection by utilization of well known conventional tests. Only the scientist in his laboratory can produce controlled culture of bacteria and he, delving in the art of such culture, must at all times employ the methods found efficient by trained scientists. Where those methods are old and well known to the art, no difficulty is encountered in a description for a patent composite which provides for their utilization or employment. In other words, Bond's tests were manifest to readers skilled in the art. No one so skilled would have any difficulty in determining what he should do when his attention was directed to the necessity of making them. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 63, 43 S.Ct. 322, 67 L.Ed. 523. As the Supreme Court has indicated, we think that intelligent bacteriologists, setting out properly to gather together the enumerated ingredients which are prescribed for the composite article, reading the description, could hardly go astray. Seabury v. Am. Ende, 152 U.S. 561, 14 S.Ct. 683, 38 L.Ed. 553. The requirement that preliminary tests must be made does not invalidate a specific method when their character and limitations are well known to the art. Min-

988

erals Separation, Ltd. v. Hyde, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286; A. B. Dick Co. v. Barnett, 2 Cir., 288 F. 799, 801.

Defendant contends that Bond merely taught how to make an aggregation lacking inventive character. We do not think so. An aggregation achieves nothing new. It is a term engrafted in the patent law either through the ingenuity of counsel or the lexicography of the courts, at a loss for a better term, to connote or express mere lack of patentable inventive quality in a combination. As said by this court in Lincoln Engineering Co. v. Stewart-Warner Corp., 7 Cir., 91 F.2d 757, the term "aggregation", if proper at all, is proper as a definition of a phrase of the term "non-invention." Where the claim constitutes a plurality of elements and their individual or collective selection fails to evidence the exercise of inventive faculty, it is of course not a patentable invention regardless of whether co-action of elements is present. On the other hand, an inventive concept may reside in the selection of a part or parts of numerous old elements. If the selection is unusual and a hitherto unsolved problem is overcome, it answers the tests of the statute and, in the absence of other limiting features, will achieve invention. So here Bond did a novel thing in the science of culture of bacteria to inoculate leguminous plants. He knew what other scientists already had suggested that certain strains worked adversely and detrimentally upon each other. Delving further, he learned for the first time that various strains of the genus are noninhibitive of other strains and can be grouped, with an entirely healthful result. As a result of his teachings, scientists learned how to make a composite inoculant without disastrous conflict of one species of bacteria with another. True, the composite inoculant had been thought of and practiced to some extent, but just as truly it had not achieved approved recognition. Indeed, scientists thought that it was a dangerous practice, and Bond, for the first time, pointed out to the bacteriologist the fact of existing noninhibitive strains and instructed him that he should select such strains and make his composite inoculant of them. Thus he taught how to make a composite inoculant, successful, efficient and fulfilling the purpose it was meant to fill. This is not so-called "aggregation." It is inventive conception.

We now approach the issue of infringement. The District Court found "that the product * * * 'Legume-Aid' is a composite inoculant for leguminous plants consisting of a plurality of selected cultures of bacteria, comprising at least two species or strains of bacteria of the genus Rhizobium, which do not affect one another in their respective abilities to fix nitrogen in association with leguminous plants for which each species or strain is specific," and that "the accused composite culture * * * 'Legume-Aid' constitutes an infringement of each and all of said Claims 1, 3, 4, 5, 6, 7, 8, 13 and 14 of said Bond patent in suit." Defendant insists that there is no evidence to sustain these findings.

In Gary Theatre Co. v. Columbia Pictures Corp., et al., 7 Cir., 120 F.2d 891, 894 and Webb v. Frisch, et al., 7 Cir., 111 F.2d 887, 888, this court has previously discussed sufficiently the application of Rule 52 (a) of Rules of Civil Procedure, 28 U.S.C.A. following section 723c, to findings of fact such as the court entered here. If there is substantial evidence to support the conclusion, though we may not agree with the trial court, we are not privileged to disturb the findings unless they are clearly erroneous. And due regard is to be given to the trial court's opportunity to observe the witnesses and to judge their credibility. Apex Electrical Mfg. Co. v. Maytag Co., et al., 7 Cir., 122 F.2d 182, 187 and cases there cited.

The burden rests upon a plaintiff to show that the defendant has made, used, or sold the patented invention; if the testimony is of equal weight the defendant must prevail. If the plaintiff makes out a prima facie case, however, the defendant must overcome it by evidence. Robinson on Patents, Vol. 3, Section 1041. Walker on Patents, Section 532. "Proof of the infringements given, that the machines made and used by the defendants were substantially like the complainant's, was sufficient, if not rebutted." Bennett v. Fowler, 8 Wall. 445, 19 L.Ed. 431; Spring and others v. Domestic Sewing Machine

Co., C.C., 9 F. 505, 509; Peifer v. Brown & Co., C.C., 85 F. 780. In a copyright case, Encyclopædia Britannica Co. v. American Newspaper Ass'n, C.C., 130 F. 460, 464, the court said: "Substantial identity, or a striking resemblance between the work complained of and that for which protection is claimed, creates a presumption of unlawful copying, which must be overcome by the defendant." To the same effect is General Drafting Co., Inc. v. Andrews et al., 2 Cir., 37 F.2d 54.

When the burden of proof is once fixed as to a particular issue, in a strict sense, the burden of producing a preponderance of evidence never shifts. But there may be and often is a shift in burden of producing rebuttal evidence to escape an adverse decision based on an uncontested prima facie case, for, once such a case is made out, the burden of proceeding with further evidence rests on the opposite party. United States v. Denver & R. G. R. Co., 191 U.S. 84, 92, 24 S.Ct. 33, 48 L.Ed. 106, 109; Harrison v. New York Life Ins. Co., 6 Cir., 78 F.2d 421; Toledo Metal Wheel Co. v. Foyer, 6 Cir., 223 F. 350; Cyclopedia of Federal Procedure, 2d Ed., Vol. 7, Sec. 3174. And it has always been the law that where the knowledge and means of proof with respect to an issue are peculiarly within the power and control of one of the parties, the burden of proof is, to that extent, placed upon him, although it would otherwise rest upon his adversary. Cyclopedia of Federal Procedure, Sec. 3174; Miller v. Lykes Bros., Ripley S. S. Co., 5 Cir., 98 F.2d 185, certiorari denied 305 U.S. 641, 59 S.Ct. 150, 83 L.Ed. 413; United States v. Denver & R. G. R. Co., 191 U.S. 84, 24 S.Ct. 33, 48 L.Ed. 106.

In this case, by its response to plaintiff's request for admissions, Federal Rule of Procedure 36, defendant admitted that the accused product is a combination or mixed culture containing two species or varieties of root nodule bacteria, i. e., Rhizobium trifolii (the clover bacteria) and Rhizobium meliloti (the alfalfa bacteria); that these two species of root nodule bacteria are contained in a moist powder base including humus; and that the accused Legume-Aid "is as efficient in its ability to fix nitrogen" in either clover or alfalfa plants as a single clover culture containing the same strains of clover bacteria is on clover plants and as a single alfalfa culture containing the same strains of alfalfa bacteria is on alfalfa plants. Defendant represents on its label that the two species of bacteria are "highly efficient selected strains." Defendant admits also that clover and alfalfa bacteria are present in the accused Legume-Aid in the proportions of 9 to 10 billion alfalfa bacteria and 14 billion clover bacteria per package, approximately the proportions recommended by Bond. Upon this showing plaintiff submitted its claim of infringement.

We have seen that Claim 1 defines a composite inoculant for leguminous plants comprising a plurality of selected cultures of different species of Rhizobium bacteria. Defendant's product, under its admission, contains the same. The patentee specifies that the cultures shall be "substantially unaffected by each other in respect to their ability to fix nitrogen in the leguminous plants for which they are specified" and the admission of defendant is that its composite of selected cultures of different species is as efficient to fix nitrogen in either clover or alfalfa as a single culture containing the same strains of clover bacteria is on clover plants and as single alfalfa species is on alfalfa plants. Plaintiff's showing, therefore, made a prima facie case of infringement, and if the evidence stood alone, it would completely justify the finding of infringement made by the District Court. As the court commented in Matheson v. Campbell, C.C., 77 F. 280 at page 284, plaintiff sustains the burden of proof, when it shows, as to infringement, that the alleged infringing product corresponds to the tests of identity. The burden is then upon the defendant to prove, if it can, that the product, though identical in composition, was not produced by the patented process. The further question presented then is as to whether defendant overcame this prima facie case, whether it has satisfactorily rebutted the presumption of infringement arising from plaintiff's evidence. That, obviously, is a question of fact, which, under the court's finding, has been decided adversely to defendant and

which we are not justified in reversing unless we must say that, under the evidence presented, it is clearly erroneous.

We have examined the evidence and, though defendant insists that it does not make its composite product in accord with plaintiff's teaching and specifically denies that it makes any tests for the purpose of determining whether the different species are inhibitive or noninhibitive of each other, in view of all the evidence, we feel that we are not warranted in saying that the findings of fact are clearly erroneous. Defendant's assertion of noninfringement is based largely upon the testimony of Curie, an interested witness, in charge of manufacture of the accused product. He flatly denied that there are inhibitive bacterial strains. Other authorities disagree, and the trial court found his statement erroneous. Having denied that there are inhibitive strains, it followed, as Curie proceeded to say, that he never made any tests for inhibition or noninhibition. His testimony is not the most convincing. He admitted that he tested the mixed culture produced by defendant in an efficiency test as compared with a single culture. He admitted making tests with reference to legumes "to determine the efficiency of one strain of legume bacteria relative to others." He made "many nitrogen determinations of various legume plants." Whether he said he was testing for inhibition or testing for efficiency of composite product as compared with single products would seem to be of little importance. The question is, did he follow the teaching of Bond in determining what were efficient and nonefficient strains. He admitted that from time to time in the manufacturing process, he discarded certain strains of bacteria as they proved to be no longer efficient or vigorous. He admitted making visual tests of the respective results of various cultures, contending that he never found undesirable or inefficient results exceeding from 10 to 20%, placing his mean at 15%. Obviously such a variation is of no small concern to the agriculturist who uses the product, if that variation is reflected in similar varying returns in crops. As a result of all this testimony, which we have read with care, we find ourselves still uncertain as to what Curie actually did and what the actual results of his tests were. At the most, we think we are not warranted in saying that the District Court clearly erred in concluding, after hearing Curie's testimony and observing him on the witness stand, that he had employed tests for efficiency of combined cultures in one composite product as compared with efficiency of single culture products and that these tests fulfilled the function of those prescribed by Bond. The evidence is not of such character that it is clear that the court was in error in its conclusion in this respect. We think the court was justified in finding that the patented process was substantially employed, especially when we remember that infringement is not negatived by mere avoidance of the best manner of practice or by failure to utilize the patent in its most advantageous form.

Remembering that identity of product raises a presumption of identity of process; that when a composition responds to the tests of identity prescribed by the patent, it is prima facie an infringement, as declared in Badische Anilin & Soda Fabrik v. A. Klipstein & Co., C.C., 125 F. 543; Holliday & Sons v. Schulze-Berge, C.C., 78 F. 493, and that Curie's testimony in explanation is far from satisfactory rebuttal proof, we think that the District Court, who saw the witnesses and heard them testify, was not clearly in error in finding infringement.

The court dismissed the counterclaim of defendant for a declaratory judgment that all the claims of the Bond patent are invalid, being impelled to this action because it felt that, in view of its holding of invalidity of the claims in suit, there was no necessity of any adjudication upon the claims not relied upon by plaintiff. Claim 2, which was not presented in issue, is a product claim, similar to those in suit. Whether it is valid has not been adjudicated and is not before us. The other claims 9, 10, 11 and 12, are claims for the method prescribed by Bond for the making of his composite inoculant. By the counterclaim defendant sought an adjudication that all claims are invalid or not infringed. Whether those claims are valid and whether defendant has infringed has never been

decided because of the District Court's belief that it was unnecessary to make such decision. In a similar situation where the trial court held that, though by counterclaim defendant sought declaratory judgment, when the court found no infringement, there remained no justiciable controversy, the Supreme Court of the United States held in Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 1117, 87 L.Ed. 1450: "* * * To hold a patent valid if it is not infringed is to decide a hypothetical case. But the situation in the present case is quite different. We have here not only bill and answer but a counterclaim. Though the decision of noninfringement disposes of the bill and answer, it does not dispose of the counterclaim which raises the question of validity. Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. [165] is authority for the proposition that the issue of validity may be raised by a counterclaim in an infringement suit. The requirements of case or controversy are of course no less strict under the Declaratory Judgments Act, 48 Stat. 955, 28 U.S.C. § 400, 28 U.S.C.A. § 400; than in case of other suits. United States v. West Virginia, 295 U.S. 463, 475, 55 S. Ct. 789, 793, 79 L.Ed. 1546; Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 325, 56 S.Ct. 466, 473, 80 L.Ed. 688; Ætna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000; Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 61 S.Ct. 510, 85 L. Ed. 826. But we are of the view that the issues raised by the present counterclaim were justiciable and that the controversy between the parties did not come to an end (United States v. Alaska S. S. Co., 253 U. S. 113, 116, 40 S.Ct. 448, 64 L.Ed. 808) on the dismissal of the bill for non-infringement, since their dispute went beyond the single claim and the particular accused devices involved in that suit." Schering Corporation v. Gilbert, 2 Cir., 153 F.2d 428, 433; Gebhard v. General Motors Sales Corporation, 77 U.S. App. D.C. 331, 135 F.2d 248, 249.

It has always been the desire of equity to dispose of all questions involved where it is at all possible to do so in order to prevent multiplicity of suits. So we think here that when plaintiff brought suit for infringement of certain claims and defendant counterclaimed seeking declaratory judgment upon all claims, the court, by judgment upon only the claims in suit, did not dispose of all issues in controversy between the parties. Defendant has a right to know whether what it is doing violates any valid claim of plaintiff's patent. It has been confronted once with a suit for infringement and, though it does not manufacture, its principal, who defends, does manufacture and distribute, and, inasmuch as defendant itself distributes the inoculant, it has a right to know whether the product it does distribute infringes any valid claim. We think this is within the language of the Supreme Court as to what constitutes a justiciable controversy. The statute provides for declaratory judgment in the interest of prevention of multiplicity of litigation. We think the court below should have heard evidence upon and decided the counterclaim for a declaratory judgment.

The judgment is reversed in so far as it determined (1) the claims in suit invalid, and (2) dismissed the counterclaim, and is affirmed in so far as it disposed of all other issues.