**SHURR et al. v. WARNER BROS. PICTURES, Inc., et al.**

**No. 327.**

Circuit Court of Appeals, Second Circuit.

June 30, 1944.

John E. Donnelly and Peter J. McCoy, both of New York City, for appellants.

Benjamin Pepper and R. W. Perkins, both of New York City (Joseph D. Karp and Stanleigh P. Friedman, both of New York City, of counsel), for defendants-appellees Warner Bros. Pictures, Inc., Vitagraph, Inc., and Jacob Wilk.

O'Brien, Driscoll & Raftery, of New York City, for defendants-appellees Frank Capra and Frank Capra Productions, Inc.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiffs appeal from a judgment, dismissing their complaint for the infringement of their copyrighted play: "The Stuffed Shirt," which they alleged the defendants plagiarized to produce the "screen play": "Meet John Doe," and a moving picture based upon it. They sued Warner Bros. Pictures, Inc., which produced the picture; Vitagraph, Inc., which distributed it; Riskin, its author; Capra, his associate, and the producer and director of the picture; Wilk, an official of Warner Brothers; and Connell and Presnell, authors of earlier plays from which "Meet John Doe" was in part taken. Eventually Frank Capra Productions, Inc. was brought in as a third party. Neither Connell, Presnell or Riskin were ever served. The only issues are whether in the production of the "screen play" and the moving picture the defendants made any use of "The Stuffed Shirt"; and, if they did, whether what they took was copyrightable. Since we answer the first question in the negative, we shall not concern ourselves with the second. The judge found that neither of the authors who could, directly or indirectly, have contributed to the production "Meet John Doe"; Connell, Swerling, Presnell, or Riskin had any acquaintance with, or access to, "The Stuffed Shirt." Presnell and Riskin testified in open court; so did both of the plaintiffs; so did Wilk and one Deakin, who like Wilk was an officer of Warner Brothers; and these were the most important witnesses, as will appear. If the findings just mentioned stand, the judgment was confessedly right; they must stand, unless they are "clearly erroneous." A careful review of the evidence, of which we shall make a brief abstract, satisfies us that they are not "clearly erroneous."

In 1922, Connell, a well-known author, wrote a story called "A Reputation," the theme of which was that an obscure man, craving publicity, publicly announced that he proposed to kill himself as a protest against the "rotten state of civilization." In the story this statement aroused extraordinary public interest, in deference to which the hero finally felt himself obliged to fulfill his pledge by suicide. Nobody suggests that "The Stuffed Shirt" could have been in the slightest degree the source of "A Reputation," for its composition was not even begun in 1922. The first version Shurr wrote alone; in December of 1935 he secured the collaboration of Leonard, and together they finished the play, and copyrighted it in February of 1936. It is an extravaganza; the scene is in a country town in Missouri, where a traveling charlatan, Anthony, picks up a yokel, Jackson, whose only title to interest consists in his extraordinary memory for details, and in his being a "human victrola." Anthony sees an opportunity for exploiting these gifts of Jackson; and takes him into his employ. They go to New York, where Anthony forms an association with a promoter of shady transactions, one Lester, to whom Anthony presents Jackson, and makes him exhibit several mnemonic feats. Anthony and Lester thereupon launch a political agitation, whose purpose is to secure an annuity of $500 a month for all persons who reach the age of eighty. They form an organization made up of local clubs scattered generally through the country; with entrance fees, insignia, membership cards, and other paraphernalia. The agitation spreads like fire, and becomes a formidable political movement with Jackson as its nominal leader. He spouts the speeches which Anthony prepares for him, and is in general a facile tool. Meanwhile Anthony and Lester are prospering by diverting the entrance fees and other income which keep flowing in; and eventually it is proposed to make Jackson a candidate for President. Anthony, while drunk, lets out the scheme to a politician, named Wentworth, who offers a large sum to Lester for the use of the movement to support a candidate for president, backed by Wentworth; and, when this candidate turns out to be disqualified, Wentworth throws his support to Jackson himself. A gangster at this point intervenes, and through a series of incidents not relevant to this controversy, Jackson finally becomes so disgusted with the whole enterprise that he goes back to the town from which he came, after marrying Lester's secretary.

In October, 1937, Connell gave to one, Jo Swerling, the right to make a stage play out of "A Reputation"; and Swerling tried to do so, and actually completed two acts, which he named, "The World is an Eight Ball." In this play a newspaper "columnist" named Erskine, sends Jane, his secretary, to a party of rich and distinguished persons. She has discovered that an old acquaintance of hers, John Doe, even after a single drink of liquor, becomes irresponsible and does not remember what he has done. Without any premeditation she chances to take John Doe to the party, where, although he is at first abashed by his distinguished fellow guests, after one drink he astounds the whole company by his outrageous behavior. He ends up by saying that the only thing for him to do is commit suicide as a protest against the rottenness of civilization. This startles everyone, causes great excitement and the news of it spreads outside. Erskine and Jane see in it great opportunities of profit, and exploit it with all possible publicity. Swerling gave up because he was unable to devise a suitable ending.

In 1939, he turned this story over to Presnell and Connell, and they used it to write a screen story entitled, "The Life and Death of John Doe," which, with certain variations, followed and completed, "The World is an Eight Ball." In this play John Doe is a clerk in the information bureau of the Grand Central Station in New York; unknown, slighted and ridiculed. Nan, the secretary of Mitchell, a "columnist," takes him to a cocktail party, where—as in "The World is an Eight Ball"—he is ignored by the crowd. In order to secure some notice he declares that he will jump off the roof of the City Hall on the next Fourth of July, because civilization is so rotten. Nan telephones this to Mitchell as a promising bit of sensational news; Mitchell seizes upon it, and starts up a popular movement upon the strength of it. This quickly grows to huge proportions, gets out of hand, and begins to trouble dominant politicians and capitalists because, being based upon the brotherhood of man, they fear that it will undermine the economic system by which they prosper. John Doe and Nan discover that they are in love; and John Doe has become converted to the movement by the

speeches which Nan writes for him and which he delivers to the faithful. He regards his original utterance as a pledge to them which he must redeem, no matter at what cost, and in spite of Nan's entreaties he eventually jumps from the roof of the City Hall on the Fourth of July before a great crowd of his followers, who wait below, singing the Battle Hymn of the Republic. The implication appears to be that his sacrifice will not be in vain.

In "Meet John Doe," the "columnist" is the female lead, Ann, who has been discharged by the editor of the paper, Connell. Norton is the owner; he has just bought the paper, and wishes to build it up for profit, although he is already very rich. In retaliation for her discharge, Ann writes a letter addressed to herself, signed "John Doe," declaring that the writer has lost his job, and has been unable to get another because of the "slimy politics" which prevail. The letter ends by saying that it seems that the whole world is "going to pot, so in protest I am going to commit suicide by jumping off the City Hall roof." Ann publishes this letter in her column as her last contribution; but to her surprise, the letter causes an enormous sensation, and the mayor of the city demands that Connell find John Doe to prevent his fulfilling his threat. When Ann tells Connell that the letter was fictitious, he accepts her suggestion that they get hold of someone who will serve as John Doe, and make use of the publicity to build up circulation. They do find a John Doe in the person of John Willoughby, a former baseball pitcher, who has injured his arm and who is then starving. Willoughby agrees to act the part of John Doe; Norton, the owner, is told of the scheme and approves; and he and Ann continue to exploit the idea by continued protest in the newspaper against the corruption and rottenness of society. Ann, who has thus kept her position upon the paper, prepares the broadcasts, and the circulation keeps increasing.

John Doe becomes satisfied that he is heading a great movement in aid of humanity, and convinces Ann of his good faith. They fall in love. She writes a sincere and moving speech for him which he delivers with great effect. John Doe Clubs form everywhere, the movement becomes nationwide and prodigious in size. A third party convention based upon the John Doe movement is to meet, but John Doe is not to be the candidate. Norton, who aspires to form a fascist government overthrowing democracy, plans to interject himself as the presidential candidate. At this junction Connell, while drunk, tells John Doe that he is being used by Norton only as a stalking-horse for Norton's political ambitions, and that Ann is conniving with him, which is confirmed in John Doe's mind because he knows of Norton's gift to her of a fur coat and a bracelet. John Doe goes to Norton's house, denounces him; and Norton in turn threatens to expose John Doe. John Doe appears at the convention, Norton tries to drag him away by his "troopers"; and the crowd rails at him as an imposter. On Christmas eve—which he had selected for the expiation—John Doe conceals himself in the City Hall, determined to jump off the roof; but members of a John Doe Club appear and with Ann succeed in dissuading him. The John Doe movement is to go on, and he and Ann are to be happy in it and in each other.

The evidence of access by Riskin to "The Stuffed Shirt" on which the plaintiffs rely is as follows. On June 1, 1936, the plaintiff, Leonard, submitted a manuscript of the play to one, Wilk, of the Vitagraph Company. Wilk read it and sent it to California, where a synopsis of it was made; but it was rejected on July 24, 1936, and on August 5th, Deakin, of the "Story Department" of Warner Brothers, wrote a letter to Leonard, saying that the studio had told him that they could not use the play. So far there is no dispute. The synopsis has not been produced, it is true, but the plaintiffs do not pretend that it was a source on which Riskin drew. What the plaintiffs rely upon is a supposed copy of the play which was in Wilk's hands for a month or more in the spring of 1940, while Riskin was still at work upon "Meet John Doe." Leonard swore that in April or May of that year he got a telephone message in New York that Wilk wanted to see him about "The Stuffed Shirt." This testimony was confirmed by Mrs. Jones, Leonard's mother, who said that in the spring of 1940 a man, who called himself Wilk, telephoned to her, and that she gave him her son's telephone number. A telephone operator, Mrs. Willis, also testified that a man named Wilk gave her a message over the telephone in the spring of 1940, asking Leonard to bring the manuscript of "The Stuffed Shirt" to Warner Brothers. Leonard swore that he went to Wilk's office, where he was told that Wilk had been look-

ing for him, and wanted the manuscript; that he went home, got a copy and gave it to Wilk, which Wilk put into a black bag. About six weeks later, Leonard said, the manuscript was returned to him by mail in an envelope addressed to him without any covering letter; with nothing inside but the "cold script." He called up Warner Brothers but could not reach Wilk; and never heard from him. Wilk denied that he had had any such interview with Leonard.

On June 13, 1940, Deakin wrote a letter to Leonard in which he said that "pursuant to your telephone inquiry as to whether we would be interested at this time in your play, 'The Stuffed Shirt', which we originally considered in 1936, we have taken the subject up with our production department, and it has been reconsidered, with the decision that at the present time there is still no interest in undertaking * * * a picture made from it." There is no dispute that this letter was written and received. On the tenth Deakin sent a telegram to Irene Lee, an employee of Warner Brothers in Burbank, California, as follows: "In June, 1936, the studio considered and rejected a play, entitled 'The Stuffed Shirt,' by Pat A. Leonard." The telegram then gave a very brief synopsis of the outline of the play, and added that at the time, although it "needed some clarification, on the whole it required only comparatively slight attention to details to make it an amusing comedy idea. The author has asked that we reconsider at this time, and I shall be glad if you will look up your report on the subject and advise if there is any interest in it at this time." To this on the 11th Lee answered that they had looked up the synopsis, "but there is still no interest."

On this evidence we should certainly not be warranted in holding the finding "clearly erroneous" that Riskin did not use "The Stuffed Shirt" in the spring of 1940. Even though we disregard Riskin's own denial and Wilk's, Leonard's story on its face cannot be true. Aside from the improbability that the manuscript would have been returned with no covering letter—a detail which incidentally was necessary to prevent detection if the story was a concoction—the documentary evidence is nearly, if not altogether, a demonstration of its falsity. There is no doubt that on June 10 or shortly before, Leonard inquired of Deakin about the play; indeed, after first denying even that, Leonard later admitted it, but said that he had "inquired to find out why I was treated so shabbily, not to get a report on the play." The opening words of Deakin's letter shows the untruth of this. "Pursuant to your telephone inquiry as to whether we would be interested at this time in your play," certainly did not describe an inquiry as to a recent "shabby" rejection of the play. It could only refer to an inquiry as to whether Warner Brothers, having rejected it in 1936, might not accept it later. Leonard would have known only too well that they were not "interested," if they had just returned his play without even a word. Furthermore, when Deakin wrote to Lee, he would not have said that Leonard was then asking Warner Brothers to "reconsider" the rejection of June, 1936, if all that Leonard had really done was to complain of the "shabbiness" of its rejection a few weeks before. The whole interview with Wilk was certainly made up out of whole cloth. Moreover, any adequate internal evidence of plagiarism is wanting. That evidence would have to consist of elements, common to "The Stuffed Shirt" and "Meet John Doe," which had not appeared either in "A Reputation," "The World is an Eight Ball" or "The Life and Death of John Doe." Although there are some such elements, either they are very trifling, or they are commonplace devices: e.g., the disclosure of Anthony, and of Connell, while each is drunk. They contribute hardly a shadow of probative value on the issue of access. The characters, the plot, the place, the incidents are patently lifted from "The Life and Death of John Doe." Riskin had no occasion to resort to "The Stuffed Shirt" for those slight similarities, from which the ingenious brains of the plaintiffs have coined the supposed plagiarism. Not only was the finding, that Riskin had no access to the play, not "clearly erroneous"; but the contrary would have been erroneous beyond doubt.

The plaintiffs have never argued, so far as we can find, that either "The World is an Eight Ball" or "The Life and Death of John Doe" was drawn in any part from a copy of "The Stuffed Shirt" which Leonard gave to Aldrich of the Columbia Pictures in April, 1936, and which Aldrich returned on May 19, 1936. The summary synopsis then taken (which is all that appears in the record) was clearly insufficient for the purpose; and indeed, so far as it "tracked" with either play, was too general to be copyrightable. Possibly they did argue in

the district court that the supposititious copy which Shurr swore he gave to one Hy Daab, or Dabb, of the Columbia Pictures at about the same time was a source of these plays. At least the judge found, as we have said, that neither Connell, Swerling nor Presnell ever had become acquainted with "The Stuffed Shirt": and that could hardly be relevant except on the theory that the two preceding plays were piracies. Upon this appeal, it is true, the plaintiffs do not so argue; and they may mean to abandon that position, if indeed they ever took it. However, against the possibility that they do not mean to abandon it, we have examined all the evidence which could support that position. It consists of the testimony of Shurr and Leonard alone; the credibility of which is certainly open to the gravest doubt. The inconsistencies in the versions of each and the improbability of the tale itself, are enough to support the findings that none of these three authors ever had access to "The Stuffed Shirt."

Judgment affirmed.