**PIPER AIRCRAFT CORPORATION,**
Plaintiff-Appellee,

v.

**WAG–AERO, INC., Defendant-Appellant.**

**No. 83–1797.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 10, 1984.

Decided Aug. 3, 1984.

Joseph A. Gemignani, Michael, Best & Friedrich, Milwaukee, Wis., for defendant-appellant.

Douglas W. Wyatt, Wyatt, Gerber, Shoup, Scobey & Badie, New York City, for plaintiff-appellee.

Before CUDAHY and POSNER, Circuit Judges, and PELL, Senior Circuit Judge.

PELL, Senior Circuit Judge.

In this trademark action, defendant, Wag-Aero, Inc., appeals from the district court order and judgment granting the plaintiff, Piper Aircraft Corporation, a permanent injunction. 553 F.Supp. 136. The defendant raises three principal issues on appeal. First, defendant asserts that the district court should have ruled the consumer survey introduced by plaintiff to be inadmissible for several reasons. Second, defendant alleges that, due to laches and acquiescence by plaintiff, the district court should have estopped plaintiff from asserting its trademark rights. Finally, defendant claims that plaintiff failed to demonstrate a likelihood of confusion. We will examine these issues in turn.

## I. THE FACTS

Piper manufactures and sells aircraft and parts for those aircraft. In 1931, Piper began to produce under the CUB trademark an airplane that became the precursor to a number of other CUB models, most recently, the SUPER CUB. The insignia of the CUB planes is a small bear standing behind the CUB logo. The CUB has been one of the most successful private planes sold in this country, with over 33,000 sold since it first appeared. As the CUB evolved, various earlier models have gone out of production. Piper maintains an inventory of spare parts for the out-of-production aircraft for some time, but eventually their supply becomes exhausted and is not replaced. There is no evidence that Piper ever produced, for domestic consumption, kits from which customers could construct home-built aircraft, although there was some evidence of kit production for foreign markets.

Richard Wagner founded the defendant company in 1960 to sell replacement parts for out-of-production aircraft to restorers. The company began to produce an annual catalog targeted for people who maintain and restore out-of-production aircraft and people who construct home-built aircraft from kits. Defendant acquired some parts from Piper distributors but manfuactured most of the parts that it sold. The only distinction in the catalogs between the two types of parts was that the parts manufactured by Piper carried serial numbers of both parties, while the parts manufactured by Wag-Aero for use in Piper planes had only a Wag-Aero serial number. Beginning in 1973, Wag-Aero prepared kits, which included engineering plans and parts, so that its customers could construct replicas of various out-of-production aircraft, including the early CUB. Defendant called the completed replica of the CUB a Cuby. In its promotional material for the Cuby, defendant's insignia consisted of a small bear slightly different than the one used by plaintiff standing behind and slightly to the side of the logo for the plane, which defendant printed as follows: CUBy.

Because defendant claims laches and acquiescence, we must trace with some particularity the development of the relationship between the parties. Correspondence between Piper and Wag-Aero began in October 1974, when Wagner sought to obtain from plaintiff the machine tools necessary

to produce various spare parts. Wagner also mentioned in his early correspondence a "hope" that his company would produce, at some future time, a replica of the early CUB. In early 1975, Wagner again wrote plaintiff and indicated that it was proceeding with its program to build a replica of the CUB, which it intended to call a CUBy. In the response of plaintiff's president to this letter, he made no mention of the CUBy project, referring only vaguely to the spare parts aspect of defendant's business. Similarly, Wagner's February 1975 reply to Piper's letter primarily referred to defendant's spare parts business. Wagner sought to institute a program that would have plaintiff refer inquiries for out-of-production parts to Wag-Aero. Furthermore, Wagner sought to take over the production of items infrequently sold by Piper.

Conflicts between the two companies, although slow in developing, began to arise in 1976. In August of that year, the Federal Aviation Administration sent to Piper's FAA coordinator an inquiry as to Wag-Aero's advertisement in its parts catalog for Piper Identification Plates. Shortly thereafter, Wagner sent to Piper a copy of its catalog, a brochure of the CUBy project, and copies of his previous correspondence with Piper. At that time, Wagner reiterated his interest in producing any Piper parts that Piper ceased producing. To this letter, Piper's director of customer services responded on September 27, 1976 (the Graham letter), stating *inter alia:* "[W]e do not intend to respond to your inquiry. Certainly you are at liberty to take any action that you consider to be in the best interest of Wag-Aero." Two days later, however, plaintiff's patent counsel wrote defendant (the Walsh letter) and, referring to a prior telephone conversation, stated: "I have indicated that Piper had not given permission to your company for use of its name and, therefore, we requested that you delete these Piper items from your catalog." Counsel went on to request information from Wagner as to how and when defendant obtained its claimed authorization to use "the Piper designation" as well as "the number and identification of articles that you are selling under the designation Piper."

From late 1976 until the institution of this suit, the parties engaged in intermittent and, ultimately, fruitless correspondence apparently designed to achieve an accommodation. In early 1977, plaintiff wrote to defendant stating that "we fail to see any benefits to Piper in releasing the type certificate of [an early Piper plane that defendant wanted to replicate] to Wag-Aero. Therefore, we feel there is no basis on which to approve your request." Wagner then indicated an intent to continue production of the replica, despite Piper's refusal to agree to the procedure. Subsequently, Piper informed defendant that defendant was not authorized to produce and sell the Piper Identification Plates, to which we earlier referred, and that the use of those plates constituted an infringement of Piper's trademark rights. Piper then requested that defendant "discontinue advertising and selling these placards." By February 1977, defendant had retained counsel to represent the company in the continuing negotiations.

## II. THE DISTRICT COURT PROCEEDINGS

Plaintiff filed its complaint in district court in October 1980. The complaint contains two counts. Count I alleges trademark infringement and unfair competition under the Lanham Act. 15 U.S.C. §§ 1111–1121. Piper's allegations centered on Wag-Aero's use of the registered names Piper, CUB, and SUPER CUB, as well as the bear cub insignia in its parts catalog and marketing of the CUBy kit. Count II alleges that Wag-Aero's use of the Piper marks constitutes a false designation of origin, in violation of another provision of the Lanham Act. 15 U.S.C. § 1125(a). Plaintiff's prayer sought preliminary and permanent injunctive relief to prevent defendant's use of plaintiff's various names in connection with aircraft kits and spare parts. Plaintiff also sought the destruction of all infringing materials in defendant's posses-

sion, an accounting for profits, costs, and attorney's fees.

The only pretrial matters relevant to this appeal were the proceedings related to the survey data offered by Piper. The purpose of the survey was to help establish likelihood of confusion. All persons interviewed were owners of private planes. The survey consisted of an interviewer giving to an interviewee a copy of Wag-Aero's 1980 parts catalog, allowing time for examination of the catalog, and then directing attention to pages where Piper parts were advertised before asking the interviewees what company they believed to have manufactured the parts and kits advertised in the catalog. All the parts on the indicated pages had, in fact, been manufactured by defendant.

Piper filed a motion *in limine*, in accordance with the process recommended in *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir.1976), for the district court to determine the admissibility of the survey before plaintiff undertook the great expense of conducting an actual survey. Only several days before the deadline established by the district court for the close of discovery, plaintiff produced to defendant a copy of the survey questions as well as the results of a preliminary survey. Among several grounds of objection, defendant asserted in opposition to plaintiff's motion that the subjects of the interviews constituted an improper survey universe and that the survey results were hearsay.

The district court granted plaintiff's motion *in limine*. The court ruled that the survey results were not hearsay because the survey merely recorded the present sense impression and existing state of mind of the interviewees and, thus, was admissible under rules 803(1) and 803(3) of the Federal Rules of Evidence. The court also refused to bar introduction of the survey on the ground that the interviewers might not be present to testify, although their testimony might be important to determine the credibility of the survey. The court determined that "the better course of action is to admit the survey with a caution to

the plaintiff that the court may be obliged to entertain a motion to strike if Piper fails to establish the interviewers' credibility to the court's satisfaction." Finally, the court stated that, since plaintiff filed its complaint in 1980 and sought both damages and injunctive relief, the survey could use any of defendant's catalogs from 1980, 1981, or 1982, despite the fact that trial did not take place until late 1982. At trial, the court admitted the survey results into evidence.

After a three-day bench trial, the court granted plaintiff's request for injunctive relief. In accordance with the decision in *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924) (Holmes, J.), the court ruled that defendant could market its parts as functional with plaintiff's products as long as it did not market the parts in a confusing manner. To test likelihood of confusion, the court utilized the test enunciated in *Helene Curtis Industries, Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1330 (7th Cir.1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978). The court held that plaintiff had established a likelihood of confusion. With respect to the parts business, plaintiff submitted the survey, which, the court held, was "probative evidence demonstrating the likelihood of confusion." With respect to the CUBy project, the court held that plaintiff had established actual confusion by its submission of three items of evidence: a letter from the Soaring Society of America, which stated: "Wag Aero Corporation has acquired the rights to produce the Piper Super Cub in kit form"; and two articles—one in a newspaper and one in a trade publication—each of which labeled a picture of the CUBy as a "Piper Cuby" or "the Cub." The court concluded that defendant had intentionally infringed on Piper's trademarks and then dismissed the alleged defenses of abandonment, laches, and the genericness of the name "Cub."

The remedy fashioned by the trial court consisted of a permanent injunction. The court referred the damages issues to a magistrate, and those issues are not part of

this appeal. The injunction precluded defendant from using plaintiff's marks or symbol in connection with manufacture, sale, or advertising for sale of aircraft kits or parts. There were two exceptions to the injunction. First, the court allowed defendant to sell parts purchased from plaintiff under plaintiff's trademarks. Second, defendant could sell parts for Piper planes which it did not obtain from Piper provided that all promotional material indicated that the parts were not manufactured by or purchased from Piper, that defendant informed the public that Wag-Aero was not connected with Piper and that Piper's warranties did not apply to these parts, and that defendant print its name and the disclaimers in print at least as large as any of defendant's marks included in the promotional material. In addition to the injunction, the court ordered defendant to destroy any material bearing any of plaintiff's names or symbols except for those materials that complied with the provisions of the injunction.

## III. ADMISSIBILITY OF THE SURVEY

■ As the statement of facts indicates, the district court admitted plaintiff's survey evidence over defendant's varied objections. Defendants first two objections—that the interviewers improperly based their survey upon an out-of-date catalog and that the class of interviewees constituted an improper universe—were rejected by the district court and merit little attention on appeal. In its survey, plaintiff utilized defendant's 1980 catalog. Defendant contends that the interviewers should have used the 1982 catalog. As the district court noted, however, since plaintiff sought both damages and injunctive relief, the interviewers could use either the catalog as of the date of trial or the catalog current at the time plaintiff filed suit. Additionally, if plaintiff were to receive no relief through this lawsuit, nothing would prevent defendant from returning to its 1980 catalog format. Thus, if we were to accept defendant's position, through the voluntary cessation of an allegedly illegal action, it would be able to evade a judicial determination as to the legality of its practices. The judiciary should not become an indirect participant in such evasive practices. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982). Finally, our own examination of the two catalogs reveals no significant changes in format that would obviate consumer confusion as to the source of the replacement parts defendant sold for Piper aircraft. The advertisement for the CUBy in the 1982 catalog appears under the banner "The Wag-Aero CUBy." Nonetheless, admissibility of the survey for purposes of the replacement parts is our only concern at this point since, as we demonstrate in Part V below, there is sufficient evidence of actual confusion with respect to the CUBy kits independent of the survey.

■ Wag-Aero also objects to the universe of interviewees represented in the survey. Defendant asserts that the universe should have been restricted to those plane owners who work on, restore, or build their own aircraft. Plaintiff responds that the universe was proper because all plane owners, regardless of whether they work on their planes themselves, are vitally concerned with the quality of the parts used. The question of the proper universe for trademark surveys has arisen only infrequently in federal litigation. See 2 J.T. McCarthy, Trademarks and Unfair Competition §§ 32:47-:48 (1973) (McCarthy). Nonetheless, we believe that the universe employed by Piper is sufficiently precise to warrant the district court's finding of admissibility. We agree with plaintiff that all owners of private planes have a substantial interest in the quality of the parts used in their planes. Thus, their impressions about the source of the parts sold by Wag-Aero are relevant to establish likelihood of confusion. Although plaintiff could have restricted the universe of the survey further, nothing compels it to have done so. As the district court recognized, the fact that plane owners who do not do their own work may be less probative on the issue of confusion goes to the weight to be given the

survey results, not the admissibility of the survey.

■ The third objection to the survey is that defendant had no opportunity to conduct discovery with respect to the final survey taken by plaintiff because the survey took place after the court-imposed close of discovery. Indeed, plaintiff did not even conduct the final survey until three days before the trial. Still, defendant's objection is without merit. Plaintiff followed the "commendable procedure" of submitting the survey questions, along with the results of a preliminary survey, to the district court for a ruling *in limine* on the question of admissibility. *See Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d at 386. The district court properly reserved until trial the question of the weight it would give to the survey. Although we do not condone plaintiff's postponement of the full survey until the eve of trial, the possibility that settlement could be reached without a trial makes the postponement understandable, due to the great costs involved in conducting a full-scale survey. Additionally, from the discovery undertaken with respect to the preliminary survey, defendant knew exactly what the format and content of the final survey would be. Thus, there was no surprise attendant upon the admission of the survey into evidence, and the fact that plaintiff did not produce the full survey prior to trial, if prejudicial to defendant, as tardy production of evidence sometimes could be, was not sufficiently so as to call for reversal.

■ In its final objection to the survey, defendant asserts that plaintiff never established the credibility of the final survey. There are two components to this contention. First, defendant asserts that the survey results are hearsay. There is little support for defendant's assertion. In fact, the commentators unanimously agree that survey results are not inadmissible hearsay; rather, the results are reports of the state of mind of the interviewees, Fed.R. Evid. 803(3), and form the basis for the opinion of an expert witness from which the expert testifies as to the likelihood of confusion, Fed.R.Evid. 703. *See, e.g.,* 3A R. Callman, The Law of Unfair Competition, Trademarks & Monopolies § 20.63 (4th ed. 1981) (Callman); 1 J. Gilson, Trademark Protection and Practice § 8.11[1] (1974); 2 McCarthy 32:53. *See also Baumholser v. Amax Coal Co.*, 630 F.2d 550, 553 (7th Cir.1980) (witness testified "as an expert and as such was entitled to rely on hearsay evidence to support his opinion, so long as that evidence was of a type reasonably relied upon by other experts in the field. The evidence need not be independently admissible."). Consequently, the hearsay objection is unavailing.

■ Second, defendant complains that it never had an opportunity to examine the interviewers to determine their credibility in their reports of the interviewees' states of mind. Long before trial, defendant had the results of the preliminary survey and deposed the survey director at length, so it was fully aware of the format of the survey. Defendant made several objections to the format of the preliminary survey, and plaintiff consequently altered parts before the final survey to alleviate some of the objections. We note that the same professional survey company undertook both the preliminary and the final surveys. Therefore, the only difficult matter is the unavailability of any of the interviewers for examination by defendant. Nonetheless, defendant was able to depose the survey director prior to trial and cross-examine him at the trial. The examination and cross-examination covered such matters as survey methodologies, instructions to the survey interviewers and supervisors, the questions asked in the survey and how they were altered to meet the objections of defendant, and the method of tabulation. We agree with the suggestion in McCarthy's treatise that the testimony of a survey director alone can establish the foundation for the admission of survey results. 2 McCarthy § 32:53. Additionally, although in its ruling *in limine* the district court specifically reserved for trial the question of the survey's credibility, we note that defendant made no objection at trial on

credibility grounds to admission of the survey. The testimony of the survey director precludes us from now finding on credibility grounds that it was plain error to admit the survey into evidence.

Consequently, viewing the record as a whole, and despite the defendant's various objections, we find that the district court properly admitted the spare parts portion of the survey.

## IV. LACHES AND ACQUIESCENCE

Wag-Aero asserts that the correspondence between the parties, summarized above in section I, establishes Piper's laches and acquiescence, either of which would lead to the reversal of the judgment of the district court. Defendant relies upon three things in its attempt to establish these defenses: first, plaintiff's failure to respond to Wagner's oblique references to the CUBy program in his initial letters to Piper and the failure specifically to object to defendant's parts program; second, the fact that some unidentified Piper representatives saw a prototype CUBy at an aircraft show in both 1975 and 1976; and finally, the September 27, 1976, letter to defendant from Piper's director of customer services.

We will consider the laches defense first. As the letters indicate, slightly more than two years elapsed between Wagner's first letter to Piper and his reference of these matters to his attorneys after Piper had complained about defendant's allegedly infringing uses of the Piper trademarks. As to the period up to February 1977, almost all of the correspondence centered around defendant's parts business. Defendant noted an intent to build a model of the early CUB plane and stated its intent to call the model "the CUBy," but it did not indicate if and when it would begin to market the CUBy. Piper did not respond to these statements of intent. We note that both of defendant's letters that contain references to the replica project primarily concern defendant's parts business, and Piper did respond to defendant's inquiries about parts.

From the time defendant brought in its attorneys in February 1977 until Piper filed its complaint in October 1980, some three-and-one-half years later, the parties attempted to settle their disagreements without resort to litigation. Thus, after February 1977 at the latest, defendant knew of the objections of plaintiff to the use of the Piper and CUBy names in defendant's various catalogs. Consequently, to sustain its alleged laches defense, defendant had to show that plaintiff was guilty of laches as of February 1977. It would disserve the strong policy in favor of nonjudicial dispute resolution if defendant successfully could assert that the three-and-one-half year period of settlement attempts contributes to the establishment of laches. *See Siegerist v. Blaw-Knox Co.*, 414 F.2d 375, 381 (8th Cir.1969).

In a recent trademark case in which the defendant asserted that laches precluded an award in favor of the plaintiff, this court noted the great deference an appellate court must give to trial court determinations with respect to the laches defense. *Blue Ribbon Feed Co. v. Farmers Union Central Exchange, Inc.*, 731 F.2d 415, 420 (7th Cir.1984). In *Blue Ribbon*, we stated that the determination whether delay is unreasonable, inexcusable, and prejudicial rests within the "sound discretion of the trial court" and we will not disturb the trial court's determination absent a "clear abuse" of that discretion. *Id., citing Baker Manufacturing Co. v. Whitewater Manufacturing Co.*, 430 F.2d 1008, 1009 (7th Cir.1970), *cert. denied*, 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971). We have adopted this deferential standard of review because of the highly fact-based nature of the laches defense. Thus, in the present case, the existence of laches turns on such issues as when Piper first became, or reasonably should have become, aware of defendant's infringement, the extent of that awareness, the credibility of the many witnesses who testified, and the nature of the written exchanges between the parties.

■ Our examination of the record fails to demonstrate that the trial court abused its discretion when it found no laches. While the tenor of Piper's initial letters to Wagner did not indicate any strong objection to the conduct of defendant, on the other hand, Wagner's early letters arguably did not demonstrate the extent of defendant's objectionable activities. The course of correspondence, when viewed in its entirety, does not reveal any prolonged delay by Piper in asserting its trademark rights. Prior to defendant's retention of counsel, defendant knew from the Walsh letter of September 29, 1976, that plaintiff objected to defendant's unauthorized use of the Piper name in its catalogs. Thus, even if Piper could have objected earlier, the district court did not abuse its discretion in holding that the delay of about two years was not unreasonable, inexcusable, or unduly prejudicial. We note that two years has rarely, if ever, been held to be a delay of sufficient length to establish laches. 2 McCarthy § 31.9.

Defendant attempts to dispel the negative impact upon its latches defense of Piper's late 1976 and early 1977 letters to Wagner by suggesting that those letters concerned only one item in defendant's catalog. The record reveals that the correspondence concerning the Identification Plates arose only after the FAA requested information from Piper concerning the sale of the plates by defendant. Nothing indicates that Piper was then aware of defendant's use of the Piper name in connection with other items. Even if plaintiff knew the full magnitude of defendant's use of the Piper name, however, the Walsh letter indicates that Piper had not given defendant permission to use its name and requested all information relevant to any authorization. Plaintiff's letter was sufficiently broad to put defendant on notice of plaintiff's objections to *any* use by defendant of the Piper name. Therefore, defendant's claim that the trial court abused its discretion in finding no laches is without merit.

■ Whereas laches is a negligent, unintentional failure to protect trademark rights, "[a]cquiescence is associated with intentional abandonment." 3 Callman § 19.64. *Accord* 2 McCarthy § 31:14 (distinguishing acquiescence, laches, and abandonment). As acquiescence imports a fact-based analysis similar to the above discussion of laches, the same deferential standard of review applies. Defendant's claim of intentional abandonment rests in the failure of Piper to object to the spare parts business or the CUBy project in late 1974 and 1975. The failure to object, defendant asserts, amounts to acquiescence. Except for one isolated comment, defendant does not suggest, and the record nowhere indicates, that plaintiff expressly acquiesced to defendant's use of the Piper name. When silence is the basis of alleged acquiescence, the doctrines of "acquiescence and laches blend together." 2 McCarthy § 31:14[B]. The similarities between the two doctrines make our finding that there was no laches instructive in evaluating defendant's claim that Piper acquiesced by silence.

As we noted, the 1974 and 1975 letters, to which defendant refers in its attempt to establish acquiescence, briefly mention defendant's spare parts business and only obliquely refer to the CUBy project. The prime focus of those letters was a proposed business deal whereby defendant would produce all spare parts for various Piper aircraft, some of which were still in production. Plaintiff's failure to respond to minor statements in letters proposing a major business undertaking do not appear to us to be encouragement for defendant's other programs. Certainly, we cannot say that the district court abused its discretion in holding that there was no acquiescence. In a patent case raising a claim of acquiescence strikingly similar to defendant's claim, in that plaintiff's representatives assertedly encouraged defendant after viewing defendant's goods at a trade show and directed its objections at only a portion of defendant's allegedly infringing activity, the Trademark Trial and Appeal Board concluded that defendant had failed to establish acquiescence. *Hershey Foods Corp. v. Ceretta*, 195 U.S.P.Q. (BNA) 246, 249–52 (1977).

■ Defendant makes one claim of express acquiescence based upon the Graham letter, written September 27, 1976. The final sentence of that letter states: "Certainly you are at liberty to take any action that you consider to be in the best interest of Wag-Aero." The statement, without contrary evidence, might be sufficient to establish acquiescence, but we need not address that question. Two days after the Graham letter, Piper dispelled any impression that it had acquiesced by sending the Walsh letter. Once again, defendant attempts to bolster its acquiescence argument by stating that the Walsh letter "contained nothing with respect to the spare parts business or the Cuby program." Examination of the Walsh letter illustrates the lack of merit in defendant's assertion. The letter states: "Piper ha[s] not given permission to your company for the use of its name." The letter goes on to request all information related to any authorization defendant had to use the Piper name. The record reveals no response by defendant to plaintiff's request for information. To suggest, as defendant does in its brief, that the letter was confirmation that Piper thought defendant "was not doing anything objectionable" is incredible.

To summarize, the only evidence that might indicate acquiescence by Piper was the Graham letter. The doctrine of acquiescence is based on notions of reliance by the purported infringer. Any reliance by defendant upon the Graham letter would have been unreasonable in light of the Walsh letter, written two days later, which leaves no doubt that Piper objected to all uses of the Piper name by defendant. Defendant has failed to show that the district court abused its discretion when it found no acquiescence by Piper.

## V. LIKELIHOOD OF CONFUSION

To determine if the district court erred when it found defendant liable to plaintiff for infringement, we must decide whether defendant's use of the Piper marks "is likely to cause confusion." 15 U.S.C. § 1114(1). To establish likelihood of confu-

sion, we have identified a number of factors:

the degree of similarity between the marks in appearance and suggestion; the similarity of the products for which the name is used; the area and manner of concurrent use; the degree of care likely to be exercised by consumers; the strength of the complainant's mark; actual confusion; and an intent on the part of the alleged infringer to palm off his products as those of another.

*Helene Curtis Industries v. Church & Dwight Co.*, 560 F.2d at 1330 (*quoting Carl Zeiss Stiftung v. VEB Carl Zeis Jena*, 433 F.2d 686, 705 (2d Cir.1970), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971)). None of these factors is determinative. In fact, we have reversed lower court decisions that have placed excessive importance on certain factors. *See James Burrough Limited v. Sign of the Beefeater, Inc.*, 572 F.2d 574, 577 (7th Cir.1978) ("Sign of the Beefeater" restaurant held to have infringed plaintiff's trademark for "Beefeater" distilled products; trial court placed undue emphasis on the lack of competition between the parties). Furthermore, even in *Helene Curtis*, the court only looked to some of the factors that it had enumerated, including actual confusion, intentional infringement, similar packaging, and consumer letters sent to plaintiff that indicated that consumers thought plaintiff manufactured defendant's products.

■ Plaintiff has made a strong showing with respect to a number of the *Helene Curtis* factors. The district court found intentional infringement on the part of defendant and actual confusion arising out of the CUBy program. These are factual determinations to which we must defer unless the findings were clearly erroneous. Both findings are amply supported in the record. One need only compare the use of the name CUBy with its namesake, CUB, and examine the similarity between the two bear cub decals used to represent the respective products in order to conclude that the district judge was not clearly erroneous when

he found that defendant intentionally infringed. *Cf. Henri's Food Products Co. v. Kraft, Inc.,* 717 F.2d 352, 359 (7th Cir. 1983). In addition, the similarity between the two marks is undeniable. Both use a small, although slightly dissimilar, bear cub standing behind the logo. Plaintiff capitalizes all three letters in CUB, but defendant capitalizes only the first three letters in CUBy while the small "y" at the end is less than half the height of the capitalized letters. The potential for confusion is more than adequate.

Defendant strongly disputes the district court's finding of actual confusion with respect to the CUBy program. The evidence of actual confusion consisted primarily of three documents: a newspaper article; a magazine article; and, a letter from the Soaring Society of America to the FAA. Even if we were to agree with defendant that the two articles did not establish likelihood of confusion, because they only indicated that reporters, and not consumers, were confused, the defendant cannot dispel the effects of the Soaring Society letter. The letter states: "Recently, the Wag-Aero Corporation has acquired the right to produce the Piper Super Cub in kit form." Defendant contends that the letter only implies that Wag-Aero had acquired FAA approval to manufacture the kit. Defendant's construction of the letter is unconvincing. While Wag-Aero may have needed FAA *approval* to market the kits, the acquisition of *rights* referred to in the letter could only have come from Piper. Defendant never suggests that the Soaring Society is not representative of the consumers of Wag-Aero and Piper products. Consequently, defendant has failed to show that the district court's conclusion that there was actual confusion was clearly erroneous.

■ With respect to defendant's spare parts business, plaintiff produced no evidence of actual confusion, but introduced the survey, discussed previously, to establish a likelihood of confusion. In the survey, of the respondents to a question about the source of the parts advertised in de-

fendant's brochure, 45% unequivocally answered Piper and 7% believed the manufacturer to be Piper. In fact, of course, defendant was the manufacturer of these parts. The percentage of respondents who thought Piper to be the manufacturer far exceeds the showing in many surveys that courts have held to be sufficient to establish likelihood of confusion. See cases collected in *Henri's Food Products Co. v. Kraft, Inc.,* 717 F.2d at 358. The high showing of potential confusion in the survey is a factor weighing strongly in favor of the district court's conclusion. In combination with the presence of the other elements of the *Helene Curtis* test that we have found to be present—intentional infringement, similarity of marks, and actual confusion—we conclude that the district court's finding that there was a likelihood of confusion is correct.

The only type of evidence in *Helene Curtis* that is not present here is misdirected consumer mail. The absence of that type of correspondence does not render erroneous the district court's conclusion that there was a likelihood of confusion. Similarly, there is enough evidence of competition between the parties, particularly with respect to the defendant's parts business, to uphold the district court decision. *James Burrough Limited v. Sign of the Beefeater, Inc.,* 572 F.2d at 577.

## VI. CONCLUSION

We have considered all the other arguments raised by the defendant and find them to be without merit. Accordingly, the permanent injunction and order issued by the district court are

AFFIRMED.

POSNER, Circuit Judge, concurring.

Although I join Judge Pell's majority opinion, I write separately to comment on his statement that a district judge's finding in a trademark or other intellectual-property case that the plaintiff was or was not guilty of laches is reversible only for a "clear abuse of discretion." Many such cases in this and other circuits so state

(sometimes without the "clear"). See, e.g., *Blue Ribbon Feed Co. v. Farmers Union Central Exchange, Inc.*, 731 F.2d 415, 420 (7th Cir.1984); *Baker Mfg. Co. v. Whitewater Mfg. Co.*, 430 F.2d 1008, 1009 (7th Cir. 1970); *Boris v. Hamilton Mfg. Co.*, 253 F.2d 526, 528–29 (7th Cir.1958); *Skippy, Inc. v. CPC Int'l, Inc.*, 674 F.2d 209, 212 (4th Cir.1982). But many others—again in this as well as other circuits—do not use the term "abuse of discretion," and imply that a finding of laches will be reversed if clearly erroneous, or maybe if erroneous, period (the position urged in Weiner, *The Civil Nonjury Trial and the Law-Fact Distinction*, 55 Calif.L.Rev. 1020, 1045 (1967)). See, e.g., *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 674 (7th Cir.1982); *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 611, 614–15 (7th Cir.1965); *Radio Shack Corp. v. Radio Shack, Inc.*, 180 F.2d 200, 206–07 (7th Cir. 1950); *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 803 (9th Cir. 1970); *Frank Adam Electric Co. v. Federal Electric Products Co.*, 200 F.2d 210, 212 (8th Cir.1952). None of the cases in either group cites cases in the other group, and none explains why the standard of review should be abuse of discretion rather than clear (or mere) error, or vice versa. This insouciance about the standard of review need not connote irresponsibility; it may reflect a pragmatic recognition that the abuse-of-discretion standard is a zone rather than a point, see Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747, 764 (1982), and a zone that overlaps clear error in appropriate cases, cf. *id.* at 784—of which laches, I submit, is one.

The clearly-erroneous standard of Fed.R. Civ.P. 52(a) that governs appellate review of the factfindings of federal trial judges is often, though not always, also the standard used to guide review of the judge's application of substantive rules to facts of the who-did-what-to-whom variety. See, e.g., *Noble v. Corporacion Insular de Seguros*, 738 F.2d 51 at 53 (1st Cir. 1984); 9 Wright & Miller, Federal Practice and Procedure § 2589 (1971). For example, if a district judge found that the defendant in a personal-injury case had been negligent, this finding, like a finding that the defendant had been going 50 miles per hour, could be overturned on appeal only if clearly erroneous. See, e.g., *Tucker v. Calmar S.S. Corp.*, 457 F.2d 440, 444 (4th Cir.1972); 9 Wright & Miller, *supra*, § 2590. Moreover, such disagreements as there are about the proper standard for reviewing determinations of "mixed questions of law and fact"—as such determinations are often called—are about whether they should be assimilated to factual or to legal determinations. See *Bose Corp. v. Consumers Union*, — U.S. —, 104 S.Ct. 1949, 1959–60, 80 L.Ed.2d 502 (1984); *Pullman-Standard v. Swint*, 456 U.S. 273, 289 and n. 19, 102 S.Ct. 1781, 1790 and n. 19, 72 L.Ed.2d 66 (1982); *Nellis v. Brown County*, 722 F.2d 853, 859–60 (7th Cir.1983); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 262 (7th Cir.1981). No one seems to think they should be treated as discretionary, and reviewed even more deferentially than pure factfindings.

Since the defense of laches is raised more often in intellectual-property cases, such as the trademark case before us, than in other types of case, it is relevant to note that clear error has been held to be the proper standard for reviewing determinations of most mixed questions of law and fact in intellectual-property cases—such questions as similarity (*Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 825 (11th Cir.1982); *Williams v. Kaag Mfrs., Inc.*, 338 F.2d 949, 951 (9th Cir.1964)), copying (*G.R. Leonard & Co. v. Stack*, 386 F.2d 38 (7th Cir.1967)), access (*Shurr v. Warner Bros. Pictures, Inc.*, 144 F.2d 200, 203 (2d Cir.1944)), and fair use (*Eisenschiml v. Fawcett Publications, Inc.*, 246 F.2d 598, 604 (7th Cir.1957); *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir.1981)), in copyright cases; likelihood of confusion in trademark cases (see, e.g., *Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.*, 428 F.2d 379, 380 (2d Cir.1970) (per curiam); *Beatrice Foods Co. v. Neosho Valley Cooperative Creamery Ass'n*,

297 F.2d 447, 449 (10th Cir.1961)); and unclean hands in patent cases (*Kalo Inoculant Co. v. Funk Bros. Seed Co.*, 161 F.2d 981, 987 (7th Cir.1947), rev'd on other grounds, 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588 (1948)). Although some such questions, particularly in patent cases, are treated as questions of law rather than questions of fact (see, e.g., *Dual Mfg. & Engineering, Inc. v. Burris Industries, Inc.*, 619 F.2d 660, 663, 667 (7th Cir.1980) (en banc) (obviousness in patent case)), none are treated as discretionary determinations.

The leading copyright treatise describes laches as "an issue of fact," 3 Nimmer on Copyright § 12.06 at p. 12–55 (1983), but it would be more accurate to call it a mixed question of law and fact (and this whether it arises in a copyright or a trademark case), in order to distinguish it from such purely factual questions (requiring no knowledge of law to answer) as how fast the defendant was driving. A finding that a plaintiff's claim against a trademark infringer is or is not barred by the plaintiff's laches—that is, by "an inexcusable delay between the time a party could have sought relief in court and the time he actually does," resulting in "prejudice" to the defendant, 1 Gilson, Trademark Protection and Practice § 8.12[12][a] (1984)—is like a finding that a defendant was or was not negligent, a conventional example of a mixed question of law and fact. Negligence is a failure to take reasonable care, laches a failure to bring suit within a reasonable time; the standard of review should be the same.

Neither negligence nor laches is a *discretionary* determination. This term, if it is to be used functionally, should be confined to the class of rulings that do not fit easily into any of the following classes: legal rulings, as to which appellate review is plenary; factual determinations involving no admixture of a legal standard, as to which appellate review is governed by the clearly-erroneous standard (applied with "due regard" for the "opportunity of the trial court to judge of the credibility of the witnesses," Fed.R.Civ.P. 52(a)); and rulings on mixed questions of law and fact, which sometimes are reviewed under the clearly-erroneous standard, sometimes receive plenary review, and sometimes are reviewed under an intermediate standard (see, e.g., *Lektro-Vend Corp. v. Vendo Co.*, *supra*, 660 F.2d at 262–63). Like findings on credibility issues, discretionary rulings are rulings to which the appellate court gives especially great—sometimes virtually complete—deference. The court does this either because (as with credibility) the determination is one that is extremely difficult for an appellate court to evaluate, or because appellate review is relatively unimportant. Either or both of these criteria are satisfied in three closely related situations (see *Mosey Mfg. Co. v. NLRB*, 701 F.2d 610, 615 (7th Cir.1983) (en banc); cf. *Noonan v. Cunard S.S. Co.*, 375 F.2d 69, 71 (2d Cir.1967) (Friendly, J.)):

1. *The trial judge's determination is not supposed to conform to a definite legal rule or standard that an appellate court might apply in reviewing the determination.* Two examples are criminal sentencing and the management of pretrial discovery—the former requiring a uniquely individual judgment, see *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949), the latter a managerial rather than legal judgment.

2. *Whether an issue is decided uniformly doesn't matter.* The most important function of appellate review is to maintain the consistency of the law; if consistency is not a desideratum, the argument for appellate review is weakened. For example, if it is not thought important whether or not jurors are allowed to take notes during the trial, the question will be left to each judge, with minimal, maybe no, appellate review. This is much like the first situation (no standard), but there is a difference. The first situation deliberately leaves decision-making standardless, on the basis of a judgment that the appellate court ought not impose a standard—that the matter is better handled on a thoroughly individualized basis. In the second situation there need be no belief that the matter

ought in principle be left to the trial judge's discretion—just no sense of a need to lay down a uniform standard just yet.

3. *The trial judge's determination depends critically on information that is inaccessible to the appellate court through the medium of a transcript or other documents.* Deciding whether closing argument, media publicity, threats, gruesome exhibits, or other forms of potentially prejudicial communication to a jury require that the verdict be set aside illustrates this category. The judge can observe the jurors' reactions and therefore get a much better sense of the jury's susceptibility to improper influence than an appellate court could do. See, e.g., *United States v. Bruscino,* 687 F.2d 938, 941 (7th Cir.1982) (en banc).

The determination of whether a plaintiff in a trademark case has been guilty of laches fits none of these categories. Laches is an important doctrine of trademark law, and unlike note-taking by jurors is as needful of uniform application as any other substantive doctrine of that law. The determination of laches is made on the record and is therefore accessible to informed appellate review; although credibility determinations may underlie a finding on laches, that is true of any issue. And unlike discovery and criminal sentencing, laches is not intended to be discretionary, that is, effectively standardless. The judge is supposed to balance the impact on the defendant of the plaintiff's delay against the reasonableness of the plaintiff's having waited as long as he did to sue and the strength of the plaintiff's case. This is the same kind of analysis that a court must go through to decide whether the plaintiff or the defendant in a personal-injury case has failed to exercise due care, or whether the performing party in a breach of contract case delayed performance to the point where he can be said to have broken the contract. In all these cases the parties are entitled to have the district court's determination set aside if clearly erroneous.

If it were true that laches "requires the delicate balancing of dozens of the compet-ing factors which are present in the typical trademark case," 1 Gilson, *supra,* § 8.12[12][b], at p. 8–117, this would be a strong argument for treating the determination of laches as discretionary. A standard that asks the district judge to consider a large number of factors (for example, the 17 factors of *Sapper v. Lenco Blade, Inc.,* 704 F.2d 1069, 1073 (9th Cir.1983)) in no particular order and with no particular weighting of each factor is nondirective; it is effectively no standard. But the quoted passage is hyperbole. The author does not mention dozens of factors, or one dozen, or a half dozen. The factors he does discuss boil down to four: (1) strength of the plaintiff's case, (2) length of and (3) reason for his delay in prosecuting it, and (4) extent of the defendant's reliance on the delay by spending money to promote his own mark. See 1 Gilson, *supra,* § 8.12[12]. Professor McCarthy summarizes laches in even simpler terms: "Estoppel by laches = delay × prejudice." 2 Trademarks and Unfair Competition 551, 565 (2d ed. 1984). See also *Armco, Inc. v. Armco Burglar Alarm Co.,* 693 F.2d 1155, 1161 (5th Cir.1982). The issue is similar to whether a defendant should be estopped to plead the statute of limitations, *Holmberg v. Armbrecht,* 327 U.S. 392, 396–97, 66 S.Ct. 582, 584–585, 90 L.Ed. 743 (1946); and there is authority (though by no means overwhelming) for reviewing findings on equitable tolling under the clearly-erroneous standard. See *Mayes v. Leipziger,* 729 F.2d 605, 608 n. 2 (9th Cir.1984); *Sperry v. Barggren,* 523 F.2d 708, 710–11 (7th Cir.1975) (semble); but see *Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 651 F.2d 687, 693 (10th Cir.1981). The ultimate criterion of laches, as of negligence, is reasonableness in the circumstances. *Clark v. Volpe,* 342 F.Supp. 1324, 1328 (E.D.1972), aff'd, 461 F.2d 1266 (5th Cir.1972) (per curiam).

If I am right that the determination of laches ought not be treated as a discretionary judgment of the trial court, then how has the "abuse of discretion" formulation become so entrenched? The answer seems to be historical; the phrase is a fossil of legal paleontology. "Laches," from the

Old French *lasche* ("lax"), originally was just a shorthand expression for the equity maxim that one who seeks the help of a court of equity must not sleep on his rights. See, e.g., *Smith v. Clay*, 3 Brown Ch. 646, 29 Eng.Rep. 743 (1767); 2 Pomeroy, A Treatise on Equity Jurisprudence 169–81 (5th ed., Symons, 1941). (There is still a general equitable doctrine of laches, see 11 Wright & Miller, Federal Practice and Procedure § 2946 at pp. 417–22 (1973); I shall get to it in a moment.) Many equitable defenses were from the start used to bar legal as well as equitable relief (fraud as a defense to a claim for damages for breach of contract is an example). But laches came into play only if the plaintiff was seeking equitable relief.

The doctrine of laches in the law of intellectual property is descended from the original equity conception, see *McLean v. Fleming*, 96 U.S. 245, 24 L.Ed. 828 (1878); *Menendez v. Holt*, 128 U.S. 514, 523–24, 9 S.Ct. 143, 145, 32 L.Ed. 526 (1888)—that law being itself of equitable origin, see, e.g., Simpson, *Fifty Years of American Equity*, 50 Harv.L.Rev. 171, 184 (1936)—but it has followed a separate path. Where once it barred just equitable relief, today it is a substantive defense and bars legal relief as well—indeed, sometimes legal but not equitable relief, see 1 Gilson, *supra*, § 8.12[12][b], at p. 8–118. There is no reason why its equity origins and character should determine the scope of appellate review. A ruling that bars a plaintiff from all relief invites fuller appellate review than a determination that bars the plaintiff from just one form of relief.

Nor should we allow ourselves to be seduced by the following syllogism: laches is an equitable doctrine; equitable relief is discretionary; therefore the grant or denial of such relief can be reviewed only for abuse of discretion. The time when equity relief really was discretionary—a judgment committed to the conscience of the chancellor, see 1 Pomeroy, *supra*, at 73–75—is past, cf. Fiss & Rendleman, Injunctions 104–08 (2d ed. 1984), the law of equity having long ago crystallized in a system of rules similar in basic character to the rules of the common law, though perhaps marginally more flexible. See the splendid discussion of the origins of equity in Maitland, Equity 1–22 (2d ed. rev. 1936); see also Baker, An Introduction to English Legal History 94–95 (2d ed. 1979); 3 Blackstone, Commentaries on the Laws of England 432, 434 (1768); 5 Holdsworth, A History of English Law 217 (2d ed. 1937); 1 Pomeroy, *supra*, at 75–78. (But what could be more flexible than the concept of "due care" which underlies negligence law?) One does not get an injunction any more by appealing to a district judge's "discretion," but by showing a right to an injunction. And one does not defend against an injunction by asking the judge to find laches as a matter of conscience but by persuading him that the elements of the defense are present. As the application of the doctrine is not a matter of discretion, its misapplication is not aptly described by the words "abuse of discretion."

Moreover, paralleling the merger of legal and equitable procedure (as in Rules 1 and 2 of the Federal Rules of Civil Procedure), equity as a body of substantive principles has become virtually indistinguishable from law; equity doctrines (fraud, laches, estoppel, many others) have become legal doctrines. See, e.g., Dobbs, Handbook on the Law of Remedies 34–35 (1973). As there is no longer any sound general reason for reviewing equity determinations under a more restrictive standard than legal determinations, it is no surprise that the standards of review for legal and equitable determinations have converged. See, e.g., *King v. Stevenson*, 445 F.2d 565, 571 (7th Cir.1971); *Federal Savings & Loan Ins. Corp. v. Cook*, 419 F.2d 1296 (7th Cir.1969); *Shapiro v. Rubens*, 166 F.2d 659, 666 (7th Cir.1948); *Breeland v. Hide-A-Way Lake, Inc.*, 585 F.2d 716, 722 (5th Cir.1978), modified on other grounds, 593 F.2d 22 (5th Cir.1979) (per curiam); *Magna-leasing, Inc. v. Staten Island Mall*, 563 F.2d 567, 569 (2d Cir.1977) (per curiam). Laches should be no exception.

The history of appeals in equity supplies an additional clue to the origins of the term

"abuse of discretion" in laches cases. In the heyday of English equity jurisprudence the whole equity power was vested in the Lord Chancellor of England. Equity decrees were issued by his subordinates but he could revise them at will. See 3 Blackstone, *supra*, at 453–54. Appellate power, if it could properly be called that, thus was plenary; but until the seventeenth century there was no appeal from the Lord Chancellor himself. See Crick, *The Final Judgment as a Basis for Appeal*, 41 Yale L.J. 539, 547 (1932). Colonial America had, instead of the Lord Chancellor, equity courts; and it was the judges of those courts (including after 1789 federal judges, who from the first were equity as well as law judges) who administered the equity jurisdiction in succession as it were to the Lord Chancellor. See Katz, *The Politics of Law in Colonial America: Controversies Over Chancery Courts and Equity Law in the Eighteenth Century*, in 5 Perspectives in American History 257, 262–82 (Fleming & Bailyn eds. 1971); Judiciary Act of 1789, § 11, 1 Stat. 78. (My little historical sketch, I should warn the reader, is oversimplified. See materials in Kimball, Historical Introduction to the Legal System 304–08 (1966).) It was natural therefore to conceive of the scope of appellate review of equity decrees as highly limited; and it was thus, one may conjecture, that abuse of discretion became the recognized standard for reviewing such decrees. See, e.g., 2 High, A Treatise on the Law of Injunctions § 1696 (4th ed. 1905). And yet despite this, review of factfindings was always more liberal in equity than in law, because of the absence of a jury and the traditionally heavy reliance in equity proceedings on documentary evidence. See *Lundgren v. Freeman*, 307 F.2d 104, 113–14 (9th Cir. 1962). The clearly-erroneous standard of Rule 52(a) is the old equity standard. *United States v. United States Gypsum Co.*, 333 U.S. 364, 394–95, 68 S.Ct. 525, 541–542, 92 L.Ed. 746 (1948); *Lundgren v. Freeman, supra*, 307 F.2d at 113–14; 5A Moore's Federal Practice ¶ 52.03[1] at p. 52–14 (2d ed. 1984). So why give that standard—a standard commonly applied as we have seen to mixed questions of law and fact as well as pure questions of law— less scope in equity than in law cases?

All this makes quite puzzling not only the cases that hold that the proper standard for reviewing determinations of laches in intellectual-property cases is abuse of discretion but also the cases that describe determinations of laches in other areas as discretionary, see, e.g., *Burnett v. New York Central R.R.*, 380 U.S. 424, 435, 85 S.Ct. 1050, 1058, 13 L.Ed.2d 941 (1965); *Gardner v. Panama R.R.*, 342 U.S. 29, 30–31, 72 S.Ct. 12, 13–14, 96 L.Ed. 31 (1951) (per curiam), and therefore subject to review under the abuse of discretion standard, see, e.g., *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 423–24, 95 S.Ct. 2362, 2374–2375, 45 L.Ed.2d 280 (1975); *Lingenfelter v. Keystone Consolidated Industries, Inc.*, 691 F.2d 339, 340–41 (7th Cir. 1982) (per curiam); *EEOC v. Massey-Ferguson, Inc.*, 622 F.2d 271, 275–76 (7th Cir. 1980), even when laches pops up well outside the normal bounds of equity jurisprudence, as in *United States v. Darnell*, 716 F.2d 479–80 (7th Cir.1983) (per curiam) (coram nobis as post-conviction remedy). But as I said earlier, abuse of discretion is a portmanteau concept that includes clear error as a special case; and it is unlikely that any of the cases I have cited would have been decided differently if the more precise and informative formula had been used. Nor has the abuse of discretion formula swept the board entirely; for just as in the intellectual-property area, many cases in other areas of the law where laches is raised as a defense review determinations of laches explicitly under the clearly-erroneous standard. See, e.g., *Allegheny Airlines, Inc. v. Forth Corp.*, 663 F.2d 751, 757–58 (7th Cir.1981); *Congress Financial Corp. v. J–K Coin Op Equipment Co.*, 353 F.2d 683, 686 (7th Cir.1965); *Central Ry. Signal Co. v. Longden*, 194 F.2d 310, 317–18, 320–21 (7th Cir.1952); *New Mexico District Council of Carpenters v. Mayhew Co.*, 664 F.2d 215, 218 (10th Cir.1981); *Tagaropulos, S.A. v. S.S. Santa Paula*, 502 F.2d 1171 (9th Cir.1974); *Esso Int'l, Inc. v.*

*SS Captain John,* 443 F.2d 1144, 1150 (5th Cir.1971).

Regarding the present case, however, I am happy to say that I have no quarrel with the majority's analysis, as distinct from its label. It recognizes that the laches issue is "highly fact-based," and it reviews the district judge's factual determination, including his ultimate determination that the defendant had not shown laches, as it would any other determination reviewable under the clearly-erroneous standard. I simply would prefer to see us discard, as an obfuscating anachronism, the term "abuse of discretion" to describe the standard for appellate review of determinations of laches—especially in intellectual-property cases.